**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Glen BORYS, Defendant-Appellant.**

**No. 84–1895.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 24, 1985.

Decided June 27, 1985.

Rehearing and Rehearing En Banc Denied Aug. 21, 1985.

Sam Adams, Chicago, Ill., for defendant-appellant.

Ruben Castillo, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and PELL, Senior Circuit Judge.

CUMMINGS, Chief Judge.

Defendant Glen Borys was found guilty after a bench trial of one count of knowingly and intentionally possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). He was subsequently sentenced to eighteen months imprisonment, followed by a three-year special parole term. Prior to trial and after a hearing on stipulated facts at which one of the Drug Enforcement Agency ("DEA") Special Agents involved, Peter O'Brien, testified, the court below denied defendant's motion to suppress. He filed a timely notice of appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the conviction.

I

The essential facts are not in dispute. On September 4, 1981, DEA agents O'Brien and Milo Grassman were monitoring arriving flights at Chicago's O'Hare Airport. At about 4:00 p.m., Borys was one of the first passengers to deplane from Delta Flight # 558 from Orlando, Florida, a known "source" city of narcotics. Several factors focused O'Brien's and Grassman's attention on Borys. Usually passengers deplaning first are well-dressed business people, traveling first class (Stip. ¶ 2). In contrast, Borys was dressed casually, had collar-length hair, and a Fu Manchu-type mustache. He was carrying two bulky garment bags, although O'Brien testified that generally first-class passengers checked through such luggage. Borys walked down the concourse rapidly, which O'Brien also thought was unusual since the plane had arrived on time. As Borys walked toward the terminal proper, he looked back in the direction of O'Brien and Grassman before continuing down the concourse.

The two agents began to follow Borys. At the main terminal area, Borys boarded an escalator to the American Airlines luggage area below. But because he was walking so fast, the agents lost sight of him by the time they reached the baggage claim area. After looking for him unsuccessfully in the adjoining Delta baggage claim area, the agents located him outside the terminal by a livery stand. He then reentered the airport, walking rapidly past the two agents, and went behind a luggage lock-up area next to U.S. Air's baggage claim, where he was hidden from view from everyone in the area for about fifteen seconds. After the defendant emerged, the agents approached him, identified themselves as federal drug agents, and requested to speak to him, to which he responded "Sure, what do you want?" (Stip. ¶ 5). O'Brien asked Borys for identification, to

which he replied that he had lost his wallet on the flight. Borys asked if he could go to the Delta ticket counter to inquire about his missing wallet. The agents said "Sure, go ahead; go find your wallet" (*id.*).

Borys returned to the upper level of the air terminal where he spoke to a Delta agent concerning the lost wallet. The two agents followed but remained some distance away by the escalators (*id.*). After Borys' conversation with the Delta agent, O'Brien asked him if he had his airline ticket, and he replied no. O'Brien asked his name, and he replied "Glen Borys." Borys was asked where he was coming from, and he replied that he was returning from a four-day trip to Orlando.

Borys then returned to the counter to talk to the Delta agent. O'Brien observed the Delta employee hand Borys a ticket folder, which O'Brien subsequently asked to see. Borys complied with this request; O'Brien saw that the ticket was in Borys' name, had been purchased for cash, was a first-class Chicago-Orlando-Chicago ticket, and that Borys had been in Florida ten days. O'Brien returned the ticket to Borys.

Borys then informed the agents he had to file a claim with Delta Airlines so that he could recover his wallet. The two agents followed Borys down to the Delta baggage claim office on the lower level. At the Delta Airlines baggage claim area, Borys was visibly shaken and continuously dropped various items (Stip. ¶ 6). He asked if he could make a phone call and was permitted to do so.

Borys continued to be visibly nervous (Stip. ¶ 7). O'Brien explained that he and Grassman had reason to believe that Borys was transporting drugs, and asked permission to search Borys' luggage, advising him of his right to refuse (*id.*). Borys refused consent, and the four returned to the vicinity of the Delta baggage office, at which point they were joined by DEA Special Agents Anderson and Fulkerson.

Anderson observed Borys remove a briefcase from one of his pieces of luggage. O'Brien told Borys that he was not under arrest, but that the luggage would be detained and an attempt made to secure a search warrant (*id.*). Borys asked if he could keep the briefcase. Anderson replied he could if he would consent to a search of it; otherwise it would be detained and an attempt made to secure a warrant (*id.*). Borys again was advised of his right to refuse, but he said "O-k, go ahead and search it, I want that briefcase" (*id.*). Anderson searched the case and found several cassette tapes and a neoprene tube with a black plastic cap that appeared to have some white powder residue and seemed to be paraphernalia used to "free base" cocaine (*id.*). Anderson confiscated the tube and returned the briefcase to Borys. O'Brien wrote a receipt for Borys' two pieces of seized luggage and explained how he could recover his bags should no warrant be obtained or no drugs found (*id.*). Borys then left the airport at about 4:45 p.m.

O'Brien and Grassman took the luggage to the DEA Airport Office, where they contacted the U.S. Customs Service and requested the services of a U.S. Customs narcotics detection dog for a "sniff" test (Stip. ¶ 8). The dog arrived at about 6:00 p.m. and reacted positively to Borys' luggage, which had been placed in a room with three other bags (*id.*). O'Brien applied for an Illinois State Search Warrant, and it was approved at 9:55 p.m. (*id.*). A search of the luggage yielded approximately 973.-19 grams of a mixture containing cocaine in several different packages in both pieces of luggage (*id.*). Borys now contends that this evidence must be suppressed. He vigorously argues that: (1) he was "seized" when O'Brien and Grassman first approached and questioned him, (2) they did so without the requisite reasonable suspicion that he was carrying drugs, (3) the investigative stop ripened into a full arrest for which probable cause was required, and (4) therefore the warrant to search his luggage should be quashed. Borys also argues that his consent to search his briefcase was not voluntary. We reject his arguments, as did Judge Plunkett.

## II

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, the Supreme Court authorized as reasonable under the Fourth Amendment limited investigative questioning by law enforcement officers. Guiding the Court in *Terry* was the substantial government interest in preventing crime and apprehending criminals, an interest that can justify some but not unlimited intrusion on an individual's interests. *Id.* at 20–22, 88 S.Ct. at 1879–1880. The Court has recently given additional guidance in sketching the parameters of what the Fourth Amendment allows short of a full arrest. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229, dealt with investigative detentions of people, while *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110, involved investigative detentions of luggage. The instant case raises both issues. We will address first Borys' encounter with the agents.

■ Not all police questioning of citizens implicates the Fourth Amendment. Consequently, the threshold question is whether a seizure has occurred. *Royer*, 460 U.S. at 497–498, 103 S.Ct. 1323–1324; *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16; *United States v. Morgan*, 725 F.2d 56, 58–59 (7th Cir.1984). If a seizure of some sort has occurred, the inquiry becomes whether the detention amounted to a full-blown arrest, requiring probable cause, or whether it was only a limited investigative stop—a so-called *Terry* stop. If the seizure was an investigative detention, then adequate justification for the intrusion must exist, and the encounter's scope must be sharply limited. *Terry*, 392 U.S. at 20.

■ Specifically the Fourth Amendment requires that reasonable suspicion support investigative stops. An investigating officer's subjective good faith or "inarticulate hunches," *id.* at 22, 88 S.Ct. at 1880, are insufficient. Instead, the officer must be able "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880 (footnote omitted). The court then must balance the governmental interests at stake against the individual's Fourth Amendment interests from intrusion on personal security. *United States v. Hensley*, —— U.S. ——, ——, 105 S.Ct. 675, 680, 83 L.Ed.2d 604; *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607; *Terry*, 392 U.S. at 20–21, 88 S.Ct. at 1879. The stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325.

■ To determine the threshold issue of whether the defendant was seized, the applicable standard is the objective test that Justice Stewart, joined by Justice Rehnquist, articulated in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497. Justice Stewart wrote:

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. * * * The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the question was a law enforcement official.

*Id.* at 554–555, 100 S.Ct. at 1877 (footnote omitted). Although the precedential value of Justice Stewart's plurality opinion may be limited by its commanding the support of only one other Justice, cf. *United States v. Saperstein*, 723 F.2d 1221, 1225–1226 (6th Cir.1983) (*Mendenhall* at best prescribes outer bounds of what is permissi-

ble), it is the law of this Circuit. *Morgan,* 725 F.2d at 58–59; *United States v. Black,* 675 F.2d 129, 133–134 (1982), certiorari denied, 460 U.S. 1068. We explained in *Black,* 675 F.2d at 134, that "[a]s long as a person remains at liberty to disregard a police officer's request for information, no constitutional interest is implicated." Relevant factors in determining whether a reasonable person would feel free to leave include the conduct of the police, the person of the individual citizen, and the physical surroundings of the encounter. *Morgan,* 725 F.2d at 59; *Black,* 675 F.2d at 134.

A substantial amount of confusion arises from the district court's consideration of whether Borys was seized, and if so whether it was reasonable under the circumstances. The court below incorrectly equated consensual questioning, which the Fourth Amendment does not address and which does not involve a seizure, with investigative detentions, which are seizures within the meaning of the Fourth Amendment but do not require probable cause due to the special limits placed on their use. The flaw in the district court's analysis lies in its considering the Fourth Amendment concept of seizure as implicating only a full-blown arrest based on probable cause. Actually, a seizure may encompass either an arrest or an investigative detention. The arresting officers must have probable cause to justify their effecting an arrest. To detain someone, they need only reasonable suspicion, provided their detention is limited in scope and duration, and is comprised of the least restrictive means available. But if the encounter does not constrain the citizen's liberty, and is questioning which a reasonable person would feel free to discontinue should such a person desire to terminate the conversation, then no seizure at all has occurred and the officer need not justify the encounter.

Despite this confusion in the lower court, a close reading of its opinion suggests it fits into the appropriate framework. The district judge began his analysis by unequivocally stating that "the agents did not stop Borys when they initially approached him" (Memo. Opinion and Order at 6). As our reiteration of the facts, *infra,* makes clear, this determination suggests that the initial contact between Borys and the two DEA agents did not constitute even a *Terry* stop. With that conclusion we agree. The judge then continued to discuss the ensuing forty-five-minute encounter between Borys and the agents as a *Terry* stop. We believe that the encounter, which began as a consensual one, did in fact evolve into an investigative detention, making much of the lower court's analysis relevant. We also agree with the ultimate conclusion below that the agents did not exceed the scope of their justification in their contact with Borys.

■ For purposes of clarity in future cases, several points must be emphasized. First, to the extent that the lower court considered O'Brien's and Grassman's initial questioning of Borys as a justifiable investigative detention, that conclusion is in error. If that contact indeed were an investigatory stop, then it would be unreasonable because of the agents' lack of reasonable suspicion. Borys' dress and behavior alone were insufficient to justify detention. See *Reid v. Georgia,* 448 U.S. 438, 440–441, 100 S.Ct. 2752, 2753–2754, 65 L.Ed.2d 890 (defendant's conformity with "drug courier" profile insufficient in and of itself to justify detention). Only when the agents questioned Borys did they acquire sufficient facts to justify detaining him. This questioning was permissible, because nothing in the facts suggests that the agents questioned Borys in a manner that would have made a reasonable person in his situation feel he could not leave, at least until Borys and the agents returned to the lower level and they informed him they suspected him of drug trafficking and wanted to search his luggage. See *infra* p. 311. Second, the district court collapsed two lines of analysis into each other. The discussion of whether a reasonable person would have felt free to leave, including consideration of the agents' conduct, Borys as an individual, and where the encounter took place, pertains exclusively to whether the question-

ing was consensual or whether it amounted to an investigatory detention invoking the Fourth Amendment. Only once a court has determined that the encounter was an investigatory stop does the separate inquiry into the justification for the stop, and its scope and duration, become relevant. Third, we reiterate the suggestion we made in *United States v. Notorianni*, 729 F.2d 520, 523 (1984), that district judges should make specific findings of fact concerning whether a reasonable person in the defendant's position would have felt free to terminate the questioning. Had the court below clearly made this finding and then concluded (as we think it implicitly did) that at some point the encounter evolved into a detention, then this Court's task of reviewing that decision would be simplified. In this case, the facts are clear, so that we can evaluate them properly in light of our earlier cases. Had the situation been otherwise, our review might have involved factfinding in the first instance, which is an inappropriate exercise for an appellate tribunal. Cf. *United States v. Sharpe*, —— U.S. ——, ——, 105 S.Ct. 1568, 1586–1588, 84 L.Ed.2d 605 (Brennan, J., dissenting) (Court engaged in *de novo* factfinding by reaching out to decide issue not presented for Supreme Court review); *Notorianni*, 729 F.2d at 523–524 (Cudahy, J., dissenting) (panel decision that no seizure had occurred was inappropriate fact-finding in absence of unequivocal determination by the district court that one in defendant's position would have felt free to leave).

■ The agreed-upon facts in this case justify our determination that the district court correctly found that the agents' initial questioning of Borys was consensual. The agents did not delay Borys or alter his movement around the terminal, allowing him to inquire after his wallet and make a personal phone call. The agents in fact followed Borys and remained at a distance while the defendant twice talked to the Delta Airlines employee at the ticket counter. The agents' questioning was conducted completely in the public areas of the airport; they did not even suggest to Borys that they move to one side, thereby indicat-

ing minimal control over Borys by the agents. See *Morgan*, 725 F.2d at 59 (no seizure although officers asked defendant to move out of pedestrian traffic while they questioned her); *Black*, 675 F.2d at 135 (no seizure during initial contact up to and including time Chicago police officer suggested the group move to the side of the concourse).

The questioning here was also quite limited. While on the upper level, O'Brien asked Borys for identification and for his name, whether he could see Borys' ticket, and how long he had been in Orlando. Such questions and conduct are not overly intrusive. The Supreme Court made very clear in *Royer, supra*, that officers' questioning individuals who are willing to listen in a public place does not amount to a seizure. 460 U.S. at 497, 103 S.Ct. at 1323. O'Brien did ask to see Borys' ticket twice, which might in some circumstances suggest an attempt to intimidate the suspect, but O'Brien did so the second time only after seeing the Delta agent hand a ticket folder to Borys. In no way was he pressuring Borys. Once O'Brien glanced at the ticket, he returned it to Borys. Officers' retaining airline tickets and driver's licenses has been a crucial factor in finding that a seizure has occurred. Suspects deprived of their ticket and identification are effectively deprived of the practical ability to terminate the questioning and leave. See *id.* at 501, 103 S.Ct. at 1325 (Royer detained when asked to accompany narcotics agents who had retained his plane ticket and driver's license without indicating he was free to depart to police room); *United States v. Cordell*, 723 F.2d 1283, 1285 (7th Cir.1983) (consensual questioning ripened into investigative stop when one officer handed airline ticket and driver's license to second officer), certiorari denied, —— U.S. ——, 104 S.Ct. 1291, 79 L.Ed.2d 693; *Black*, 675 F.2d at 136 (same). Borys' quickly retrieving his ticket refutes any impression a reasonable person might have that he was being detained. In any case, nothing suggests that the questioning was

so intense and so repetitive that it could amount to interrogation.

Although Borys spent forty-five minutes in the airport from the time he deplaned until he finally left, the time during which the agents questioned him was quite brief. Continual interrogation for forty-five minutes would present a completely different picture from the sporadic questioning spanning three-quarters of an hour at issue here. Cf. *Royer*, 460 U.S. at 502–503, 103 S.Ct. at 1326–1327 (continued questioning in private, enclosed room when officers had detained defendant's driver's license and airline ticket and retrieved his luggage without his consent was unreasonably intrusive investigative detention); *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir.1982) (defendant seized when, among other things, officers continued questioning).

Borys emphasizes that his "asking" O'Brien and Grassman whether he could try to retrieve his missing wallet, his telling them where he was going and why, and his asking them if he could make a phone call, indicate that he did not feel free to leave. And perhaps he did not. But the question is not what Borys actually felt, but what a reasonable person in his situation would have believed. See *Notorianni*, 729 F.2d at 522. The circumstances do not suggest the coerciveness that would have caused a reasonable person to feel restrained. Moreover, Borys' comments are at best ambiguous; he could just as readily have been being polite when he phrased his remarks to the agents as questions rather than as declarative statements. At least until the time that Borys, followed by the two agents, returned to the lower level, the encounter had been completely consensual.

█ But when the two agents explained that they suspected Borys of transporting drugs and asked permission to search his luggage, the consensual questioning had ripened into an investigative stop. Borys had been questioned about his identity and travel plans by two federal drug agents who had tailed him for some time before they finally informed him that they sus-

pected him of a major crime and that they wanted to search his luggage. In these circumstances where Borys knew that the agents had positively identified him as a suspect, a reasonable person would not have felt at liberty to leave. See *United States v. Berry*, 670 F.2d 583, 597 (11th Cir.1982) (*en banc*) ("Statements which intimate that an investigation has focused on a specific individual easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention.") (footnote omitted).

Subsequent events confirm this conclusion. After Borys had made his phone call and refused consent to search his luggage, the two agents accompanied him back to the Delta baggage claim area, rather than following him as they had done earlier. There two other DEA agents joined the group, so that Borys was surrounded by four people he knew suspected him of carrying drugs. His being questioned by four people, while not probative, was highly indicative that by then a seizure had occurred. In *Notorianni*, 729 F.2d at 523, we determined that the questioning of four people by two officers did not constitute a seizure. Here, however, one person was being accosted by four agents, surely an intimidating situation for anyone. Although agent Anderson informed Borys he was not under arrest, O'Brien told him that his luggage would be detained unless Borys forfeited his right to refuse consent to a search of the two garment bags. In these circumstances the confrontation by four DEA agents constituted a seizure.

█ Reasonable suspicion supported this investigative stop. As already noted, *Terry* and its progeny require officers to point to objective facts to support their detaining an individual. In the instant case, Borys had arrived from a source city for narcotics. Although traveling first-class, he had carried two bulky garment bags into and off the plane. He had purchased the first-class ticket with cash, he was dressed quite casually and he had no

identification.[1] He was walking extremely fast, so fast the agents could not keep up. When questioned, he was extremely nervous, so much so that he continually dropped things. Finally, he gave the two agents a deceptive answer to the length of his stay in Florida. His stating that he had been in Florida only four days when he had in fact been there ten days deviates from the more usual picture of someone staying a very short period of time, perhaps only a few hours, but claiming to be gone for a longer period of time. The length of his stay, however, is not the relevant factor. What fueled the agents' suspicions, and justifiably so, was Borys' lying about how long he had been away rather than the actual length of the stay. Borys' dissembling, coupled to the other observed facts, would have indicated to O'Brien and Grassman that something was not right, thus justifying them in detaining Borys briefly.

█ The government has also carried its burden of proving that the detention of the defendant was properly limited in scope and duration. The purpose of the stop was to verify or dispel the agents' suspicion that Borys was trafficking in illegal drugs, a legitimate and substantial government interest. *Royer*, 460 U.S. at 498–499, 103 S.Ct. at 1324–1325; *United States v. Mendenhall*, 446 U.S. at 561–562, 100 S.Ct. at 1880–1881 (Powell, J., plurality opinion). Once Borys was detained, the detention was quite brief. See *Royer*, 460 U.S. at 502–503, 103 S.Ct. at 1326–1327 (factor contributing to finding of unlawful arrest was officers' continued interrogation in a private room). Borys was asked twice for permission to search his luggage and was twice advised of his right to refuse consent, which he exercised. Thereafter, he was free to leave the airport, which he did. The investigative stop never matured into an arrest, and the Fourth Amendment was not violated.

## III

█ The more difficult question is whether the agents' seizure of Borys' luggage exceeded the bounds described by the Supreme Court in *Place, supra*. *Place* applied to seizures of personal luggage the standards articulated in *Terry, supra*, regarding seizures of individuals. 462 U.S. at 709, 103 S.Ct. at 2645. In *Place* the agents involved detained the defendant's luggage for ninety minutes while they transported the bags from LaGuardia Airport, where defendant Place had been questioned, to Kennedy Airport, where a narcotics detection dog was available. The Second Circuit's assumption that reasonable suspicion existed to detain the bags was not at issue before the Supreme Court. Instead that Court's analysis focused on whether holding the bags for an hour and a half exceeded the allowable scope of an investigatory detention.

Applying to the case the limitations applicable to investigative detentions of the individual, the Court concluded that "[t]he length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." *Id.* It reached this conclusion by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 703, 103 S.Ct. at 2642. The Court observed that the ninety-minute detention was made intolerable by the interference it posed with the defendant's possessory interest in the luggage that he was carrying, as well as the restriction of his liberty interest occasioned by the disruption of his travel plans from having to remain with the luggage or continue on his way without it. *Id.* at 708–709, 103 S.Ct. at 2645.

---

1. The stipulated facts inform us that Borys' wallet was indeed found in the Orlando airport several days after his detention at O'Hare. That his story of having lost his wallet was in fact true does not vitiate the suspiciousness to trained narcotics agents of his claiming to have no identification. What is relevant is what the facts and reasonable inferences therefrom would indicate to experienced officers at the time, not what later events proved the facts to be.

Clearly the seventy-five-minute detention involved here, if permissible at all, is at the outer bounds of the Constitution. The Supreme Court was very clear in *Place* that although it was prescribing no hard-and-fast rule due to the necessarily fact-bound determinations affecting each individual investigatory stop, it had "never approved a seizure of the person for the prolonged 90-minute period involved here and [could] not do so on the facts presented by this case." *Id.* at 709–710, 103 S.Ct. at 2646.[2] We recently applied *Place* to find a three-hour detention of luggage unreasonable. *Moya v. United States,* 761 F.2d 322, 327 (1984). While the instant situation presents a close question, we conclude that the seventy-five-minute detention involved lies within the outer bounds of the Fourth Amendment.

There are several significant differences between *Place* and the case at bar. The Court stated in *Place* that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." 462 U.S. at 709, 103 S.Ct. at 2645. Nonetheless, "in assessing the effect of the length of the detention, we take into account whether the po-

lice diligently pursue their investigation." *Id.* Moreover, while

> the 90-minute detention of respondent's luggage is sufficient to render the seizure unreasonable, the violation was exacerbated by the failure of the agents to accurately inform respondent of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage if the investigation dispelled the suspicion.

*Id.* at 710, 103 S.Ct. at 2646. In *Place,* although the agents knew Place would be arriving at LaGuardia Airport at a certain hour, no drug detection dog was at that airport and the agents had seemingly made no effort to secure one. Had a dog been available at LaGuardia, thus avoiding the necessity of transporting the luggage all the way across Queens to Kennedy Airport, the detention would have been substantially shortened. Furthermore, the agents involved misled Place about where they were taking his luggage, telling him they were taking it to a federal judge to try to secure a search warrant.

In the instant situation, these exacerbating and contributing factors are missing. Admittedly the DEA agents did not inform Borys where they were taking his luggage

---

**2.** Some language in the Supreme Court's recent decision in *United States v. Sharpe,* —— U.S. ——, 105 S.Ct. 1568, 84 L.Ed.2d 605, might suggest that the Court may be moving away from its emphasis on the duration of the stop as an important factor in assessing its reasonableness. Indeed, such a suggestion caused Justice Marshall to concur in the judgment only. *Id.* at ——, 105 S.Ct. at 1577.

This fear, however, would seem to be unfounded. In question in *Sharpe* was only a 20-minute detention, so that the case did not nearly approach the 90 minutes at issue in *Place, supra,* and in fact fit just within the American Law Institute's suggested limit on *Terry* stops of 20 minutes. See ALI, Model Code of Pre-Arraignment Procedure § 110.2(1) (1975). What concerned the Chief Justice, writing for the Court, was the Fourth Circuit's decision to adopt a *per se* time limit on all investigative stops. *Sharpe,* —— U.S. at ——, 105 S.Ct. at 1575. In fact, Justice Marshall argued in his concurrence for such an established limit. *Id.* at ——, 105 S.Ct. at 1579–1581. The Court has

repeatedly refused to adopt rigid rules, preferring instead case-by-case determination of reasonableness. The majority opinion acknowledged that a *Terry* stop could continue so long that it would become unreasonable and violate the protections afforded citizens by the Fourth Amendment. *Id.* at ——, 105 S.Ct. at 1575. But the opinion pointed out that while the time involved is an important factor, a court must also consider other factors, particularly law enforcement purposes.

Given the factual context of the case, and the decision of the Fourth Circuit invalidating a 20-minute detention, the Court's opinion appears to address only its determination that Fourth Amendment analysis remain flexible. It cannot be read as disavowing the repeated insistence in other similar cases that the length of the detention is crucial to analyzing whether the allowable limits of an investigative detention were exceeded. See *Hensley,* —— U.S. at ——, 105 S.Ct. at 683–684; *Place,* 462 U.S. at 709–710, 103 S.Ct. at 2645–2646; *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325.

or how long they intended to hold it, but they did tell him how he could retrieve his bags. Moreover, nothing in the record suggests that the agents were in any way lackadaisical in their attempt to establish the requisite probable cause for a search warrant. A narcotics detection dog was present at O'Hare Airport, so that the detention was not prolonged needlessly by transporting Borys' luggage elsewhere. Nor did the agents mislead Borys regarding what they were doing with the bags. Many factors could contribute to the dog's not being immediately available. Several flights might have arrived at once. DEA agents such as O'Brien and Grassman could not predict precisely when they would require the services of a dog, for they do not have cause to suspect passengers on every flight they have under surveillance. They question only a small number of those they suspect, and even fewer are asked to consent to a search of their luggage. This inability to know in advance whether a dog will be needed means that imposing an absolute maximum time requirement would be overly burdensome, absent some indication that the agents were derelict in some way.

It must be emphasized that merely having a single narcotics detection dog available somewhere at a large and busy airport like O'Hare does not necessarily immunize a detention of luggage from the requirements of the Fourth Amendment. In *Moya*, we stated that "[t]he officers who apprehended Moya admitted that they stationed themselves at the airport specifically to investigate the transportation of illicit drugs. Under these circumstances, we believe it is reasonable to expect officers to arrange to have a narcotics detecting dog readily available." 761 F.2d at 327. The three-hour detention in *Moya* was clearly excessive, given the officers' knowledge

that they might require a drug detection dog.

■ Similarly in the instant situation the DEA agents knew they might need a drug detection dog. Nonetheless, they are not required to have a dog immediately available, only readily available. This is especially true when the officers are unsure where and when they might spot someone behaving in a manner to justify detaining the suspect's luggage.[3] The agents here carefully informed Borys how he might retrieve his luggage, thus mitigating their intrusion on his rights. Consequently, while the instant situation is similar in many ways to the detentions found unreasonable in *Place* and in *Moya*, sufficient differences exist to justify our affirming the district court.

## IV

■ Defendant's final contention is that he did not voluntarily give the agents permission to search his briefcase. The determination of consent is essentially a factual one, and we cannot overturn the district court's finding unless it is clearly erroneous. *Morgan*, 725 F.2d at 58. Moreover, the agents' statement to Borys that they meant to try to secure a search warrant for his luggage if he did not consent cannot by itself invalidate Borys' consent. *United States v. Dennis*, 625 F.2d 782, 793 (8th Cir.1980). The agents twice informed him of his right to refuse, a circumstance we have considered to be "highly relevant." *Morgan*, 725 F.2d at 58. Borys in fact exercised that right with regard to his other luggage, only consenting to the search of the briefcase because he preferred to take it with him.

The agents had adequate cause to detain the luggage, albeit only for a brief period of time, so that their demand that Borys either consent to the search of the brief-

---

**3.** The First Circuit is in accord with our analysis. See *United States v. West*, 731 F.2d 90, 92 (1984) (the Fourth Amendment does not require DEA agents to "have a dog waiting near the gate whenever a sniff test of a known suspect's baggage is either probable or possible"), certiorari denied, — U.S. —, 105 S.Ct. 956, 83 L.Ed.2d 963. Had Borys elected to remain with the luggage until a sniff test had been performed, we might be less willing to countenance a seventy-five-minute delay. See *id.* at 93–94. But that issue is not before us, and we do not base our decision here on Borys' prior departure from the airport.

case or leave it with them was legitimate. Borys cannot argue that his consent was coerced merely because the agents had adequate grounds to insist they be allowed to retain the briefcase for a short period of time. Nor would his consent have been coerced even if his luggage had been detained an unreasonably long period of time, for the voluntariness of his consent should be analyzed in view of the circumstances at the time consent was given and not vitiated by later unforeseen developments. In the instant situation, we cannot say that the district court's finding of a voluntary consent to search the briefcase was clearly erroneous.

Because the government did not exceed the boundaries imposed by the Fourth Amendment as explicated by *Terry, supra,* and its progeny, the district court's judgment is affirmed.