**UNITED STATES of America, Plaintiff,**

v.

**Verlyn Shawn ROUX, Defendant.**

**No. FCR 90–5.**

United States District Court, N.D. Indiana, Fort Wayne Division.

Aug. 1, 1990.

608

David H. Miller, Asst. U.S. Atty., Fort Wayne, Ind., for plaintiff.

Kimmerly A. Klee, Fort Wayne, Ind., for defendant.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on defendant's motion to suppress. An evidentiary hearing was held on May 14, 1990. A response to the motion to dismiss was filed by the government on June 25, 1990, to which defendant replied on July 5, 1990.

### Factual Background [1]

The events giving rise to this motion to suppress began on February 28, 1990, when defendant, Mr. Roux, accompanied by Carmella Brooks, arrived at the Fort Wayne Baer Field Airport in a leased auto-mobile driven by Jerry Tanksley. On this date, Mr. Roux, using the name Kevin Wilson, boarded an American Airlines airplane destined for Los Angeles, California. Mr. Roux had purchased his ticket for this flight to California in Knoxville, Tennessee, and was scheduled to return to Fort Wayne, Indiana on March 7, 1990. Unknown to Mr. Roux, narcotics agents had received information from Drug Enforcement Administration agents at the drug interdiction detail at the Knoxville, Tennessee airport that Mr. Roux was a suspected drug courier. Acting on this information, Officer Scott Huffine, a member of the Allen County Federal Drug Task Force, went to the Baer Field Airport terminal to observe Mr. Roux leaving on his flight to California. Huffine observed that Mr. Roux had two pieces of luggage, a blue nylon soft-sided suitcase and a beige nylon garment bag. Both pieces of luggage bore identification tags with the name Kevin Wilson and listed his address as 110 Oak Street, Fort Wayne, Indiana. Officer Huffine noted the address, and between February 28, 1990 and March 7, 1990, Officer Huffine attempted to verify the address by driving down Oak Street and also by checking Dressers Cross Index. Huffine's investigation revealed that there is no such address in Fort Wayne, Indiana.

On March 7, 1990, a group of law enforcement officials, all members of the Allen County Federal Drug Task Force [2], waited at the Baer Field terminal for Mr. Roux's return flight to arrive from California [3]. At approximately 3:30 p.m., Mr. Roux disembarked from the plane with the same luggage, the blue suitcase and the

1. The factual summary is compiled from the suppression hearing and where there is an evidentiary dispute it is so indicated.

2. The Allen County Federal Drug Task Force consists of highly experienced members of federal, state, and local law enforcement agencies. The following officers were involved in the investigation and arrest of Mr. Roux: Special Agent John C. McGauley, FBI; Officer Scott Huffine, Allen County Police Dept.; Detective Sergeant George E. Colby, Allen County Police Dept.; Lt. Ralph West, Allen County Police Dept.; Agent Barry Carew, Drug Enforcement Administration; Officer Robert L. LaLone, Fort Wayne Police Dept.; Officer Thomas E. Hawkins, Indiana State Police; Special Agent Kirk Meyer, Drug Enforcement Administration; Special Agent James Cronin, Alcohol, Tobacco, and Firearms; and Special Agent Paul Surletti, Internal Revenue Service.

Officer David Royse of the Allen County Police Department, along with his certified narcotics detection dog, Max, was also involved in the investigation.

3. The officers had already verified with the American Airlines ticket agent that the defendant was, in fact, on the flight, using the name Kevin Wilson.

beige garment bag, which he had taken to California.

The Allen County Drug Task Force had previously contacted Officer David Royse, of the Allen County Police Department, to check all the luggage which was on Mr. Roux's flight to Fort Wayne with his narcotics detection dog. After all the bags were unloaded from the airplane and placed in the airport's baggage room, Officer Royse led his dog past all of the bags letting him smell each of the bags[4]. As the dog was led past Mr. Roux's luggage, the dog alerted positively to the blue suitcase, indicating that the suitcase contained narcotics. Royse then notified by radio the members of the Allen County Drug Task Force that his dog had alerted on a suitcase and described the suitcase to the officers. Mr. Roux's luggage was then placed with all the other luggage to be claimed by the owners.

Detective Sergeant Colby and Special Agent Carew were conducting surveillance inside the airport terminal and in the baggage claim area. These officers observed that an individual, later identified as Arthur Ware, met Mr. Roux at the airport. Mr. Roux and Mr. Ware momentarily left the airport terminal without Mr. Roux's luggage. Mr. Ware moved his vehicle closer to the exit near the baggage claim area. Mr. Roux then returned to the airport terminal, followed by Mr. Ware. Mr. Roux went over to the baggage claim area, looked at the baggage, and left the area. Mr. Ware then went to the baggage claim area, picked up Mr. Roux's two pieces of luggage, met Mr. Roux at the door of the terminal and the two proceeded out of the terminal together. Once outside, Mr. Ware and Mr. Roux walked over to Mr. Ware's vehicle, placed one bag in the trunk, and placed the other bag on the curb by the passenger side of Mr. Ware's vehicle.

Upon seeing Mr. Roux and Mr. Ware exit the airport terminal with Mr. Roux's luggage, Officer Robert LaLone of the Fort Wayne Police Department and Agent Kirk Meyers of the Drug Enforcement Administration, approached the individuals in their undercover vehicle. Officer LaLone and Agent Meyers drove their undercover vehicle up to within ten feet of Mr. Ware's vehicle, exited their vehicle, and approached Mr. Ware and Mr. Roux with their guns drawn. Immediately after Officer LaLone and Agent Meyers approached Mr. Ware and Mr. Roux, Trooper Tom Hawkins of the Indiana State Police and Agent Jim Cronin of ATF (who were in Cronin's car which was parked directly in front of Mr. Ware's vehicle) exited their vehicle and approached Mr. Ware and Mr. Roux. Neither Hawkins nor Cronin had their weapons drawn[5]. As the four officers came near Mr. Roux and Mr. Ware they identified themselves as narcotics officers and instructed the suspects to place their hands on the car and gave them a brief pat down search to determine if the suspects were carrying weapons. Officer Hawkins searched Mr. Roux and Officer LaLone searched Mr. Ware. After ascertaining that the suspects were not armed, Officer LaLone and Agent Meyers put

---

**4.** Officer Royse was not told which bags belonged to the defendant.

**5.** Mr. Roux testified that as Hawkins and Cronin approached Mr. Ware's vehicle, both officers had their guns drawn and pointed at Mr. Roux and Mr. Ware. However, LaLone, Hawkins, and McGauley all testified that neither Hawkins nor Cronin (nor any officer other than LaLone and Meyers) had their guns drawn while Mr. Roux and Mr. Ware were being detained. Furthermore, on cross examination, Mr. Roux stated that he wasn't sure how many officers had their guns drawn:

Q. Now, you say that everybody had their guns drawn when they confronted you at the car?

A. I said I believe that all of them had their guns drawn. I'm not sure that all of them did. I know at least two of them did.
Q. And you don't know about the rest?
A. I'm not positively sure.
Q. You didn't see them but you did see two you're sure?
A. Mmm-mm.
Tr. at 132.

Based on this testimony, after assessing the credibility of all the witnesses, the court finds that none of the officers other than LaLone and Meyers ever drew their guns while Mr. Roux was being detained or questioned.

their weapons away [6]. Neither Mr. Ware nor Mr. Roux were handcuffed at this point [7].

Approximately thirty seconds after Hawkins and Cronin came in contact with Mr. Roux, Agent John McGauley of the FBI appeared on the scene. As Agent McGauley approached, he observed that Officer LaLone had his handcuffs out and his weapon drawn but was holding the weapon down by his leg. Agent McGauley instructed LaLone to holster his weapon and to put away the handcuffs as they would not be needed. Agent McGauley then presented his identification to Mr. Roux, informed him that all of the officers were narcotics officers and that Mr. Roux was under suspicion of transporting narcotics. Agent McGauley further informed Mr. Roux that he was free to leave and that he was not under arrest but that the officers wished to ask him some questions if he would cooperate [8]. Mr. Roux expressed his desire to cooperate and stated that he would accompany the officers to the airport police station to further discuss the matter [9].

The Baer Field Airport police station is located approximately one hundred yards away from where the officers had stopped Mr. Ware and Mr. Roux, thus the officers accompanied Mr. Ware and Mr. Roux on foot to the police station. Although the officers walked with the two suspects as they moved from the car to the station, the suspects were not in custody, were not handcuffed, and the officers did not grasp onto the suspects' body in any fashion. The Baer Field Airport police station is rather large and consists of a lobby, a lounge, offices, and several large conference rooms. Mr. Roux was led into one of the conference rooms. Officer Surletti and Agent McGauley went into the conference room with Mr. Roux and the other officers waited in the lounge.

Inside the conference room Agent McGauley began questioning Mr. Roux. Agent McGauley asked Mr. Roux if he would consent to a search of his luggage. Agent McGauley informed Mr. Roux that he could refuse to consent and that he was still free to leave. However, Agent McGauley further informed Mr. Roux that if Mr. Roux did not consent to the search, McGauley would proceed to obtain a search warrant that afternoon. Mr. Roux agreed to a search of his luggage and executed a written consent form to that effect [10].

**6.** Officers LaLone and Hawkins testified that LaLone and Meyers had their guns drawn for approximately 30 to 60 seconds.

**7.** Mr. Roux testified that after Officer Hawkins searched Mr. Roux, Mr. Roux's hands were then cuffed behind his back and remained cuffed until he was in the conference room of the airport police station. Mr. Roux could not recall who allegedly put the handcuffs on him. Carew, LaLone, and Hawkins each testified that Mr. Roux was not in handcuffs at any time prior to his arrest, which took place in the airport police station immediately after Mr. Roux's luggage was searched and the cocaine was discovered. The court disbelieves Mr. Roux and finds that Mr. Roux was not handcuffed until after the officers searched his luggage and discovered the cocaine.

**8.** Mr. Roux testified that Agent McGauley did not advise him that he was free to leave. However, Agent McGauley testified that he specifically told Mr. Roux that he was not under arrest and that he was free to leave. McGauley's testimony was corroborated by the testimony of Officers LaLone and Hawkins, both of whom testified that they heard McGauley advise Mr. Roux that he was not under arrest. Therefore, the court finds that Agent McGauley did in fact tell Mr. Roux that he was not under arrest and that he was free to leave.

**9.** Mr. Roux testified that after Agent McGauley told Mr. Roux that the officers wanted to ask him some questions, Mr. Roux replied that he thought he should not say anything without an attorney present. Agent McGauley and Officer Hawkins both testified that Mr. Roux was very cooperative and indicated that he wished to voluntarily discuss the matter. The court finds the testimony of McGauley and Hawkins to be the most credible and finds that Mr. Roux did in fact tell the narcotics officers that he would voluntarily answer their questions.

**10.** Mr. Roux testified that he understood that the form he signed was a consent to search his luggage. Mr. Roux further testified that when he signed the consent form he felt like he did not have a choice because if he didn't sign the form, McGauley would have obtained a search warrant. Mr. Roux testified that he did not want to appear uncooperative by refusing consent.

It is important to note that the Seventh Circuit has held that narcotics agents' statements to a

Also at this time, consent was obtained from Mr. Ware to search his vehicle. Once this consent was obtained from Mr. Ware, the luggage was removed from the trunk of Mr. Ware's vehicle and brought to the lobby of the airport police station. Mr. Roux was given the opportunity to seat himself where he could observe the search of his luggage. Officer Huffine and Officer Colby searched the luggage in the presence of Mr. Roux and Agent McGauley. Upon searching the luggage, Office Huffine found a quantity of a rocklike substance. This rocklike substance was field tested and tested positive for cocaine. Agent McGauley then placed Mr. Roux under arrest, had him handcuffed, and advised him of his *Miranda* rights [11]. Mr. Roux refused to talk further with the officers in the absence of an attorney.

## Discussion

On April 23, 1990, Mr. Roux filed a motion to suppress the evidence obtained in the search of his suitcase. Mr. Roux admits that he consented to the search of his luggage by members of the Allen County Federal Drug Task Force. However, Mr. Roux argues that at the time his consent to search was extracted, Mr. Roux had been involuntarily detained for a time exceeding the limited restraint permitted by the United States Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Thus, Mr. Roux argues, his consent was tainted by his unlawful confinement and was, therefore, invalid.

In *Terry* the Supreme Court held that consistent with the Fourth Amendment, a police officer who observes suspicious activity may, though he lacks probable cause traditionally necessary to make an arrest, stop an individual briefly to investigate the circumstances provoking the suspicion, provided that the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* 88 S.Ct. at 1880. A *Terry* investigative stop is a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity. To determine whether an officer's suspicion of criminal activity was reasonable, a court must evaluate the totality of the circumstances as they appeared to the officer at the time of the stop. *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

It is abundantly clear that the officers in the present case possessed reasonable suspicion for at least an investigatory stop. The factors supporting such a finding include [12]:

(1) Mr. Roux, using an alias, had purchased a round-trip ticket in Knoxville, Tennessee for Los Angeles, California, departing Fort Wayne, Indiana on February 28,

suspect that they will try to secure a search warrant for the suspect's luggage if he does not consent does not invalidate the suspect's consent. *United States v. Borys,* 766 F.2d 304, 314 (7th Cir.1985); *United States v. Morgan,* 725 F.2d 56, 58 (7th Cir.1984).

**11.** It is undisputed that the defendant was not advised of his *Miranda* rights until after the evidence was discovered. However, this fact does not invalidate the defendant's consent to search his luggage. See *United States v. Glenna,* 878 F.2d 967, 971 (7th Cir.1989) where the Seventh Circuit adopted the holding of several federal circuit courts that a consent to search is not an incriminating statement and thus there is no possible violation of Fifth Amendment rights.

**12.** In his brief the defendant states that "the majority of said 'factors' are pure hearsay, and at the suppression hearing, Defendant's hearsay objections were sustained. The admission of any or all of said 'factors' was not to show the truth of the matters asserted, but rather, to show what information may have been in the officers' minds at the time they converged on this Defendant." Defendant appears to be asking the court to not consider these factors in determining whether the officers' had a basis for detaining the defendant. The defendant has correctly stated that the evidence referred to was admitted only for the purpose of showing what was in the officers' minds as they encountered Mr. Roux and Mr. Ware. However, reasonable suspicion, as well as probable cause, is determined by an objective test based on the knowledge of the officers at the time of their encounter with the suspect. Thus, the court may properly consider the factors enumerated herein for the purpose of determining whether the officers possessed reasonable suspicion (or probable cause) to detain Mr. Roux.

1990, and returning to Fort Wayne, Indiana on March 7, 1990.

(2) A Drug Enforcement Administration report given to the officers stated that Mr. Roux was involved in narcotics trafficking and that Mr. Roux had fled the Knoxville, Tennessee airport when approached by agents of the Drug Enforcement Administration.

(3) Mr. Roux, accompanied by Carmella Brooks, arrived at the airport on February 28, 1990 in a leased automobile driven by Jerry Tanksley. Both Tanksley and Brooks were awaiting trial in state court on narcotics charges.

(4) Mr. Roux's luggage, a blue nylon suitcase and a beige nylon garment bag, bore an identification tag with the name Kevin Wilson of 110 Oak St., Fort Wayne, Indiana. 110 Oak St., Fort Wayne, Indiana is a non-existent address.

(5) On February 28, 1990 Mr. Roux boarded an airplane bound for Los Angeles, California, and on March 7, 1990, Mr. Roux, again using the alias Kevin Wilson, arrived by airplane in Fort Wayne, Indiana, from Los Angeles, California.

(6) On March 7, 1990, after Mr. Roux's luggage was removed from the airplane, a certified narcotics dog reacted positively to the presence of controlled substances in Mr. Roux's blue nylon suitcase.

(7) An individual later identified as Arthur Ware met Mr. Roux at the Baer Field Airport terminal on March 7, 1990 and both Mr. Roux and Mr. Ware entered and left the baggage claim area several times.

(8) Mr. Ware moved his vehicle close to the exit near the baggage claim area, reentered the baggage claim area, picked up Mr. Roux's luggage, met Mr. Roux at the door of the terminal, and began loading the luggage into the vehicle.

Taken together, these eight factors clearly created adequate grounds for suspecting Mr. Roux of carrying drugs and for, at the least, temporarily detaining him while the officers attempted to verify or dispel their suspicions.

■ The court must next address the contention that the officers' method of approaching and stopping Mr. Roux exceeded the bounds of a *Terry* stop and amounted to a full-fledged arrest. As the Seventh Circuit has repeatedly noted, the issue of when an investigatory stop turns into an arrest has been the subject of much judicial debate. *United States v. Ocampo*, 890 F.2d 1363 (7th Cir.1989). Courts have been unable to develop a bright-line test to determine when, given the "endless variations in facts and circumstances," police-citizen encounters exceed the bounds of mere investigative stops. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). In general, officers may take such steps as are "reasonably necessary to protect their personal safety and to maintain the status quo" so that the limited purposes of the stop may be achieved. *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

■ The Seventh Circuit has rejected the proposition that a *Terry* stop becomes an arrest merely because an officer pointed a gun at the suspect. *United States v. Serna–Barreto*, 842 F.2d 965, 967 (7th Cir. 1988); *United States v. Novak*, 870 F.2d 1345 (7th Cir.1989). In *United States v. Ocampo*, 890 F.2d 1363 (7th Cir.1989), the Court stated that there was no per se rule against the use of a weapon during an investigatory stop, and that a determination must be made of whether the officer's actions were reasonably related in scope to the circumstances at hand. Specifically, the officer must be allowed "to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day and the reaction of the suspect to the approach of the police are all facts which bear on the issue of reasonableness. *United States v. Serna–Barreto*, 842 F.2d at 967.

■ Defendant points out to the court that in the present case the defendant was stopped by a group of officers in a public place in daylight hours, the defendant was not known to be armed or dangerous, the

defendant's actions were visible to the officers, and the defendant offered no resistance and made no suspicious moves. Defendant thus concludes that "there was no justification whatsoever for 8–10 officers[13] converging on the Defendant with guns ablazing when there was no intent to arrest him at that time." Defendant fails to note, however, that the crime under investigation was narcotics trafficking by a known narcotics dealer (who had fled when approached by narcotics officers in Nashville, Tennessee) and the defendant's luggage had been identified by a certified narcotics dog as containing narcotics. Furthermore, it is well-documented that "many drug traffickers are armed and they sometimes shoot policemen." *United States v. Serna–Barreto*, 842 F.2d at 967. Although Mr. Roux was not known to be armed and dangerous, when Agent Meyers and Officer Hawkins approached Mr. Roux they knew he was carrying narcotics and they knew Mr. Ware had had the opportunity to give Mr. Roux a weapon. Under these circumstances, the court finds it reasonable for the officers to have momentarily held Mr. Roux and Mr. Ware at gun point until after a pat search was completed. Balancing the factors listed in *Serna–Barreto*, the court finds that the officers did not exceed the bounds of an investigative *Terry* stop when they detained Mr. Ware and Mr. Roux at their car and performed a pat search of both men.

Defendant argues that he was "seized" without justification from the time he was stopped until the time Agent McGauley informed him he was officially under arrest. A seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry*, 88 S.Ct. at 1879 n. 16. The Supreme Court has framed the test as whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *see also United States v. Brady*, 842 F.2d 1313, 1314 (D.C.Cir.1988). The test assumes a citizen not only reasonable but "innocent of any crime." *Gomez v. Turner*, 672 F.2d 134, 140 (D.C.Cir.1982). It further assumes that the citizen is aware of police duties to keep the peace and prevent crime, and that that "awareness, coupled with feelings of civic duty, moral obligation, or simply proper etiquette, will often lead a reasonable person to cooperate...." *Id.* The record clearly indicates that after ascertaining that Mr. Ware and Mr. Roux were not armed, Agent McGauley informed Mr. Roux that the officers would like to ask him some questions, but he was not under arrest and was free to leave. At this point, Mr. Roux was no longer "seized" for Fourth Amendment purposes. As the Seventh Circuit explained in *United States v. Borys*, 766 F.2d 304, 309 (7th Cir.1985):

> Actually, a seizure may encompass either an arrest or an investigative detention. The arresting officers must have probable cause to justify their effecting an arrest. To detain someone, they need only reasonable suspicion, provided their detention is limited in scope and duration, and is comprised of the least restrictive means available. But if the encounter does not constrain the citizen's liberty, and is questioning which a reasonable person would feel free to discontinue should such a person desire to terminate the conversation, then no seizure at all has occurred and the officer need not justify the encounter.

**13.** In his brief, defendant states that "'Max', a trained police protection dog was also in the extended area of the initial encounter." It is not clear to the court whether the defendant is arguing that the presence of the dog converted the *Terry* stop into an arrest, or that the presence of the dog made his voluntary consent to further questioning involuntary. In any event, the court wishes to clarify a few points regarding Max's presence. First, the evidence established that Max is a narcotics detection dog, not a police protection dog. There is no evidence that Max would attack anything other than luggage containing narcotics. Second, while it is unclear from the testimony at the suppression hearing exactly where Max was positioned when Mr. Roux and Mr. Ware were detained, Mr. Roux admitted to the court that the dog did not come close to him while he was being detained.

Thus, from the time Mr. Roux was told he was free to leave until he was told he was under arrest, there is no need for the government to justify the officers' actions since Mr. Roux's Fourth Amendment rights were not implicated during this time period. Mr. Roux testified that he did not feel free to leave because he was handcuffed. However, the court disbelieves Mr. Roux's testimony and has found that Mr. Roux was not handcuffed until after he was officially arrested after the search of his luggage revealed the presence of cocaine. In his reply brief in support of his motion to suppress, defendant states that he was taken to a small room for questioning and thus felt that he was "confined". However, the testimony at the suppression hearing established that the conference room in which Mr. Roux was questioned, by only two officers, was a large room, about twelve feet by twelve feet. Furthermore, the door to the conference room was left open during the questioning of Mr. Roux. There is no basis for Mr. Roux's assertion that he was confined in the conference room. Defendant further states that several officers were waiting outside the conference room, in view of the defendant, and that the officers had their jackets off enabling the defendant to see the officers' guns in their holsters. The sight of the officers and their exposed guns apparently intimidated the defendant and made him feel that he could not have left the conference room if he had expressed his desire to do so. Nevertheless, the officers' had not drawn their guns or indicated to the defendant in any way that they would shoot the defendant if he was to try to leave. The test for determining whether a person has been "seized" is an objective test. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *United States v. Borys,* 766 F.2d 304, 308 (7th Cir.1985). There is no evidence in this case which would indicate that a reasonable person in Mr. Roux's position would not have felt free to end the questioning.

Defendant asserts that the present case is similar to *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), in which the Court held that the defendant's consent to a warrantless search of his luggage was invalid because the defendant was being illegally detained. In *Royer* the Court explained:

[I]t is submitted that the entire encounter was consensual and hence Royer was not being held against his will at all. We find this submission untenable. Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.

*Royer* is easily distinguished from the case at bar. First, the officers in the present case did not retain any of Mr. Roux's personal possessions or in any other way impede his journey. Second, and most importantly, Mr. Roux was told several times that he was free to leave. He was also told that he was free to refuse consent to a search of his luggage.

Applying the objective test set forth in *Mendenhall,* the court finds that Mr. Roux voluntarily accompanied the officers to the airport police station, voluntarily submitted to questioning, and voluntarily consented to a search of his luggage. Mr. Roux was not "seized" at the time he gave his consent to search his luggage. Therefore, he could not possibly have been "unlawfully seized" and thus the evidence obtained during the search of Mr. Roux's luggage was not obtained in violation of Mr. Roux's Fourth Amendment rights. Consequently, the evidence discovered in Mr. Roux's luggage is admissible evidence.

Even if this court had found that the initial detention of Mr. Roux exceeded the bounds of an investigative *Terry* stop and amounted to a full-fledged arrest, the evidence discovered in Mr. Roux's luggage would still be admissible because probable cause existed to support such an arrest. The court bases this conclusion on the

eight factors [14] listed earlier, describing the suspicious actions of Mr. Roux and Mr. Ware. Of particular importance is the sixth factor: "On March 7, 1990, after Mr. Roux's luggage was removed from the airplane, a certified narcotics dog reacted positively to the presence of controlled substances in Mr. Roux's blue nylon suitcase." The United States Supreme Court has recognized that trained dogs are often used to search luggage in airports:

> The courts are not strangers to the use of trained dogs to detect the presence of controlled substances in luggage. There is no indication here that this means was not feasible and available. If it had been used, Royer and his luggage could have been momentarily detained while this investigative procedure was carried out. Indeed, it may be that no detention at all would have been necessary. A negative result would have freed Royer in short order; *a positive result would have resulted in his justifiable arrest on probable cause* (emphasis added).

*United States v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 1328–9, 75 L.Ed.2d 229 (1983) (footnote omitted).

In the present case, a trained narcotics dog had sniff-searched [15] Mr. Roux's luggage, and alerted to the presence of narcotics in the blue nylon suitcase, prior to Mr. Roux being detained by the officers. When the officers initially stopped Mr. Roux, they clearly had no intent to arrest him at that time, but merely wished to ascertain if he was carrying weapons and to request his voluntary cooperation in the search of his luggage. While the officers did not formally arrest Mr. Roux when they detained him at his car, and the opinion of this court is that Mr. Roux was not arrested at this time, the officers nevertheless had sufficient probable cause arrest Mr. Roux if they had wished to do so. Thus, insofar as defendant claims that probable cause did not exist to support an arrest and that the evidence obtained in the

search of his luggage should be suppressed based on this lack of probable cause, defendant's claim is without merit.

### Conclusion

For the foregoing reasons defendant's motion to suppress is hereby DENIED.

---

**14.** See footnote 12, *supra*.

**15.** In *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Court held that a "canine sniff" of luggage is not a "search" for Fourth Amendment purposes due to the unintrusive nature of the procedure. Thus, Mr. Roux's Fourth Amendment rights were not implicated when the dog sniff-searched his luggage.