**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Gary PALEN, Defendant-Appellant.**

**No. 85–1721.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1985.

Decided June 12, 1986.

Rehearing and Rehearing In Banc Denied July 15, 1986.

---

Michele Smith, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Gregory J. Schlesinger, Schlesinger & Krasny, Ltd., Chicago, Ill., for defendant-appellant.

Before WOOD and ESCHBACH, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

WILLIAM J. CAMPBELL, Senior District Judge.

Defendant Gary Palen was convicted of knowingly and intentionally possessing approximately 986.48 grams of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). Defendant brought a pretrial motion to suppress the narcotics due to an alleged illegal seizure outside the parameters of the Fourth Amendment to the United States Constitution. The motion was denied after a four-day hearing. Subsequently, a one-day bench trial was commenced before Judge Hubert L. Will of the United States District Court for the Northern District of Illinois. Defendant was found guilty and sentenced to 18 months' imprisonment to be followed by a 3-year special parole term. Defendant Palen now appeals the district court's denial of his motion to suppress pursuant to 28 U.S.C. § 1291. For reasons set forth below, we affirm.

On May 20, 1984 at approximately 10 a.m. U.S. Drug Enforcement Agent Robert Fulkerson, stationed at O'Hare International Airport, observed defendant Palen disembarking from an airplane from Ft. Lauderdale, Florida. Fulkerson, who had been working at O'Hare for six years, testified at trial that he observed defendant walking "unusually slow" as if he was "walking on eggshells." (Tr. 21, 22). Defendant fit the drug courier profile enunicated in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 1322, 75 L.Ed.2d 229 (1983). Among other things he was young, casually dressed in jeans and carried a nylon gym bag. Fulkerson claims he noticed bulges below defendant's knees (the district court did not

---

[*] The Honorable William J. Campbell, Senior United States District Judge of the Northern District of Illinois, is sitting by designation.

believe Fulkerson's claim he noticed the bulges).

According to Fulkerson, defendant entered the concourse area and looked around. He then proceeded to a flight monitor, looked around some more, and then walked to a nearby gate for a flight scheduled to depart to Anchorage, Alaska. The flight was scheduled to leave at 11 a.m. At this point another Drug Enforcement Agent, Carl Ekman, joined Agent Fulkerson. At trial Ekman corroborated Fulkerson's testimony, adding defendant's pants "didn't hang right." (Tr. 274). Ekman claimed defendant looked tired and walked slowly; it took defendant 90 seconds to walk 75 feet to his gate of departure. The two agents continued to watch defendant for another 15 minutes as Palen sat down to watch television.

The agents testified that at 10:25 a.m. they approached defendant and sat in seats on each side of him. (Defendant notes there was a wall behind him). Agent Fulkerson identified himself as a federal officer and revealed his badge. He asked defendant if he could speak with him. Defendant did not object and, when asked for some identification, produced an Alaskan driver's license with his correct name. Agent Fulkerson also asked to see defendant's airplane ticket. Defendant handed him two tickets, one in the name of Tom Hunter (for a Fort Lauderdale to Chicago to Anchorage flight) and another in the name of Chuck Halverson (for a flight from Anchorage to Fort Lauderdale). The Hunter ticket was one-way, first-class and was purchased on that same day, May 20, the day it was to be used. The flight left Fort Lauderdale at 7 a.m. The other ticket was purchased on May 15, five days earlier. Defendant told Agent Fulkerson the reason for the assumed names was that he had purchased the tickets from newspaper ads. Fulkerson did not believe the newspaper ad explanation since the Hunter ticket was purchased on the same day of the flight and the flight was departing at 7 a.m.

Fulkerson returned defendant's license and tickets to him. At this point he told defendant he was conducting a drug investigation but that defendant was not under arrest. Fulkerson asked defendant why he went to Florida. Defendant responded that he was visiting friends. Fulkerson asked defendant if he was carrying drugs. Defendant responded in the negative. This answer prompted Agent Ekman to ask defendant if he would mind a search of his luggage (including defendant's suitcase, camera bag and gym bag). Ekman informed defendant the search was voluntary and he had the right to refuse. While defendant denied he consented to a search, it was only after Agent Ekman searched the gym bag and found plastic wrap and Baggies that the record indicates defendant explicitly stated something to the effect of "I don't want you to go any further." (Tr. 238–239). Agent Fulkerson now informed defendant that while he was not under arrest and free to leave, his bags would be detained and tested for drugs by a U.S. Customs dog since they now had reason to believe he was engaged in the transportation of illegal drugs. Fulkerson informed defendant that if the dog failed to indicate there were drugs in the bags, they would be returned to defendant. The agents claimed their entire conversation with defendant up to this point lasted no more than five minutes. Defendant claims the confrontation lasted closer to fifteen minutes.

Agent Fulkerson prepared receipts for the gym and camera bags and the airline tickets while Agent Ekman took the bags away to a U.S. Customs post located a short distance away at O'Hare. Fulkerson allowed defendant to keep the ticket to Anchorage in his possession. At this point he asked defendant for his driver's license one more time to verify information on it. Fulkerson claims that when handing the license back to defendant, defendant opened the front of his jacket to put the license in the inside breast pocket. It was at this point Fulkerson claims he noticed a bulge in the breast pocket. This prompted him to conduct a *Terry* pat-down of defendant in the area of the bulge. Upon doing this Fulkerson felt several lumps. (De-

fendant claims in the fact section of his brief that when Ekman left Fulkerson "took the airline tickets again, grabbed the front of his jacket with both hands, and patted down his chest without going to any particular spot.") (Defendant's br. p. 8). When Fulkerson asked about the newly-discovered lumps, defendant claims he told Fulkerson it was "some cigarettes and stuff for my camera." (Tr. 351). Fulkerson claims defendant said the bulges were "nothing." (Tr. 67). In any event, Fulkerson went into defendant's breast pocket at this point and found four plastic bags which ultimately were determined to be cocaine. Defendant was then placed under arrest. It was approximately 10:30 a.m. Incident to the arrest, Fulkerson conducted a full pat-down of defendant. He found three more bags outside of defendant's jacket and two bags below defendant's knees.

This case is remarkably similar to *U.S. v. Borys*, 766 F.2d 304 (7th Cir.1985), which contains an excellent summary of the status of the law in this area by Chief Judge Cummings.[1] In *Borys*, a passenger fitting the *Royer* drug courier profile, like our defendant, deplaned with garment bags in hand, moving at an abnormal pace. Agents in *Borys* approached defendant (indeed, one agent was Fulkerson), and Borys was asked for and produced an airline ticket. Borys did not object to answering questions and his ticket was for first-class. Borys was told he was not under arrest but that his luggage would be detained in order to get a warrant (in our case, it was detained for a dog test). When Borys asked if he could keep a briefcase, the agents advised him he could but only if it was searched. Borys consented and drug paraphernalia and white powder residue were discovered. The other bags were then seized under a "return when proved innocent" policy. Because of the similarity between *Borys* and the instant case we shall follow the analysis in *Borys* closely in order to reach our decision here.

In *U.S. v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Supreme Court stated that when a private citizen is approached, a seizure occurs, "... only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S. at 554–555, 100 S.Ct. at 1877. The Seventh Circuit adopted this test in *U.S. v. Black*, 675 F.2d 129 (7th Cir.1982). More recently, in *Royer v. Florida, supra*, the Supreme Court re-established that a seizure within the meaning of the Fourth Amendment does not occur if a police officer merely approaches a private citizen and asks him to answer a few questions. "... law enforcement officers do not violate the provisions of the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions ..." *Royer*, 460 U.S. 497, 103 S.Ct. at 1324 (see also *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)). In *U.S. v. Notorianni*, 729 F.2d 520 (7th Cir.1984), we stated that, "... merely accosting a person in an airport, identifying yourself as a federal agent, and asking the person whether he is willing to answer questions do not create a setting in which the average person does not feel free to thumb his nose at the agent." 729 F.2d at 522 (Cudahy, J. dissenting). Hence, the initial inquiries by a federal agent and a subsequent consensual, short question and answer period does not constitute a Fourth Amendment seizure and does not violate either the *Mendenhall* "reasonable person" test adopted by this Circuit or *Royer*.

Most recently, in *Borys*, this court concluded no seizure occurred when officers: questioned Borys with his consent (without the questioning being intense or repetitive), did not delay or alter defendant's move-

---

**1.** For other helpful summaries see: *U.S. v. Verrusio*, 742 F.2d 1077 (7th Cir.1984); *U.S. v. Cordell*, 723 F.2d 1283 (7th Cir.1983); *U.S. v. Black*, 675 F.2d 129 (7th Cir.1982).

ment around the terminal (less than even minimal control over defendant), asked defendant for his identification and his airline ticket, asked defendant how long he had been away from home, and quickly returned the ticket to defendant. This is basically and without material exception what transpired in the instant case and therefore we hold there was no Fourth Amendment seizure of defendant Palen up to the point when he produced his driver's license and airline tickets. This consensual questioning did not mature into an investigative stop.[2]

In *Borys* we also stated that when the agents informed a defendant he was suspected of trafficking in narcotics and asked to search his belongings, the mere consensual questioning session which did not constitute a seizure turned into an investigative stop. An investigative stop constitutes a seizure and must be supported by an agent's reasonable suspicion defendant is involved in criminal activity. When telling a defendant he is suspected of trafficking in narcotics, this becomes a seizure because the person, once told he is a suspect, no longer feels free to leave the scene of the questioning. The *Borys* court summarized:

> ... a seizure may encompass either an arrest or an investigative detention. The arresting officers must have probable cause to justify their effecting an arrest. To detain someone, they need only reasonable suspicion, provided their detention is limited in scope and duration, and is comprised of the least restrictive means available. But if the encounter does not constrain the citizen's liberty, and is questioning which a reasonable person would feel free to discontinue should such a person desire to terminate the conversation, then no seizure at all has occurred and the officer need not justify the encounter. *Id.* 766 F.2d at 309.

In the instant case we believe the agents had a reasonable suspicion defendant could be involved in criminal activity at the time the consensual questioning turned into an investigative stop, justifying a seizure. At the time Agent Fulkerson informed defendant he was conducting a drug investigation and asked defendant if he had any drugs in his possession (creating the investigative stop), he knew the following facts: defendant had arrived from a source city for narcotics and fit the *Royer* drug courier profile. He was walking at an abnormal pace. His airline ticket was in an assumed name. While defendant told Agent Fulkerson he purchased the ticket from a newspaper ad, this explanation was probably false since the ticket was purchased on the same day as the flight and the flight departed at 7 a.m. The ticket was one-way, first-class (typical of drug courier conduct). Defendant was in Florida for a relatively short period of time (approximately five days) for a tourist from Alaska. Following the direction of *Borys*, we hold the investigative stop was supported by reasonable suspicion. In reaching this conclusion, we emphasize defendant's suspicious response to why the ticket was purchased in an assumed name and how he secured it. However, we note in making this ruling that the investigative stop was supported by reasonable suspicion, we have considered all of the facts summarized above and employed a "totality of circumstances" type of analysis. Cf. *Reid v. Georgia*, 448 U.S. 438, 440–441, 100 S.Ct. 2752, 2753–2754, 65 L.Ed.2d 890 (defendants matching the drug courier profile alone insufficient in itself to justify detention); *U.S. v. Black, supra,* 675 F.2d at 129 (fact that a defendant arrived from a drug source city early in the morning and had no other luggage than shoulder bags insufficient to justify seizure).

**2.** See *U.S. v. Black,* 675 F.2d at 136 (Swygert, J. dissenting) where we stated:

... we believe it is clear that the mere request for and voluntary production of such documents does not constitute a seizure, but rather falls into the category of a non-coercive police-

citizen encounter. As several courts have realized, however, the retaining of the documents beyond the interval required for the appropriate brief scrutiny, may constitute a "water-shed point" in the seizure question. (citations omitted).

After Agent Fulkerson told defendant he was conducting a drug investigation and asked him if he had any drugs, Agent Ekman asked defendant if he would mind if his baggage was searched. Ekman claims defendant consented to the search of his gym bag. Defendant denies ever giving his consent. We note, significantly, that it was only after plastic wrap and Baggies were found in defendant's gym bag that the record documents any explicit objection to a search by defendant. We also note, "The determination of consent is essentially a factual one, and we cannot overturn the district court's finding unless it is clearly erroneous." *Borys*, 766 F.2d at 314 citing *United States v. Morgan*, 725 F.2d 56, 58 (7th Cir.1984). Reviewing the record, we find nothing offensive in the events that led up to and through the search of defendant's gym bag in the instant case.

 During the search of defendant's gym bag, plastic wrap and Baggies, items commonly used to transport illegal drugs, were found. At this point we believe Agent Ekman was justified in seizing defendant's bags in order to have them presented to a narcotics detection dog. There was a reasonable suspicion that defendant was involved in criminal activity from the finding of the plastic wrap and Baggies. Importantly, Agent Ekman explained to defendant that he was free to leave, that he was not under arrest, and that if the dog test proved negative for drugs defendant's baggage would be returned to him. The agents also allowed defendant to keep his airplane ticket to Anchorage in his possession. This follows the procedure employed and approved of in *Borys*. As Agent Ekman left with the bags, Agent Fulkerson asked defendant for his driver's license a second time to verify information on it. There was nothing offensive about this request. As Agent Fulkerson returned the wallet to defendant, and defendant opened his jacket, Fulkerson noted a bulge two to three inches in width, three inches wide and four to five inches in height. At this point we believe a warrantless search of defendant's bulge was justified. Narcotics are often found after a search of bulges of this shape and/or size (see *U.S. v. Ilazi*, 730 F.2d 1120 (8th Cir.1984); *U.S. v. Elsoffer*, 671 F.2d 1294 (11th Cir.1982)). Any incriminating evidence in defendant's possession could have been destroyed before a warrant could be secured. In sum, we agree with Judge Will when he concluded that Fulkerson, upon noticing the bulge, had probable cause to believe the bulge contained illicit drugs and therefore had probable cause to make a search of defendant's person and, ultimately, an arrest. The other bags found in defendant's possession were properly secured pursuant to the search.

Having analyzed the conduct of the agents on a step-by-step basis and having found no conduct outside the parameters of the Fourth Amendment to the United States Constitution up to the time of defendant's arrest, we find the district court's denial of defendant's motion to suppress appropriate and therefore AFFIRM the lower court ruling.