UNITED STATES of America, Plaintiff,

v.

Esther JARAMILLO and Fenet Jaramillo, Defendants.

No. 88 CR 72.

United States District Court,
N.D. Illinois, E.D.

Feb. 13, 1989.

Debra Devaney, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Lauren Weil, Federal Defender Program, Philip Krasny, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

On September 28, 1987, defendants Fenet Jaramillo and Esther Jaramillo were arrested at O'Hare International Airport after federal agents discovered nearly two kilograms of cocaine secreted on their bodies. The Jaramillos, who are husband and wife, were indicted on January 29, 1988, for violations of 18 U.S.C. § 1952 and 21 U.S.C. §§ 841(a)(1), 846 (1982 & Supp. IV 1986). After the indictments, both defendants moved to suppress the seized cocaine, as well as any statements made after the cocaine was seized. We referred these motions to Magistrate Bernard Weisberg, who, after conducting a suppression hearing and supplemental hearing, recommended that they be granted. *See* Report and Recommendation ("Rep.") 23. The government moved to reconsider, raising a ground not previously advanced, but Magistrate Weisberg held that this new argument was waived and, treating the motion as one addressed to his discretion, denied the request for reconsideration on December 2, 1988 ("Dec. 2 Ruling"). Both sides filed objections to the Magistrate's Report. For the reasons set forth below, we adopt the Magistrate's findings of fact, modify his conclusions of law, but reject the Magistrate's ruling that the arguments raised

in the government's motion for reconsideration have been waived. We accept these arguments and hold that the searches in question were incident to lawful arrests. Accordingly, we deny the motions to suppress.

## I. The Suppression Hearing

Magistrate Weisberg conducted the suppression hearing on March 29 and April 4 and 5, 1988, and held a supplemental hearing on October 14, 1988. The testimony at the hearings is set forth at length in Magistrate Weisberg's Report, see Rep. 2–12, but a rather detailed summary of the testimony and Magistrate Weisberg's proposed findings is necessary here.

It is undisputed that Fenet and Esther Jaramillo arrived at O'Hare at approximately 4:30 p.m. on September 28, 1987, after flying in on an Eastern Airlines flight from Miami. Fenet Jaramillo, who is 55 years old, came to the United States from Colombia in 1964, has lived in Miami since 1973 and became a citizen in 1984. Esther Jaramillo is 56 years old and came to the United States in 1982. The Jaramillos were married in 1985.

When they disembarked from their flight, the Jaramillos were observed by Drug Enforcement Administration ("DEA") Agents George Mays and Robert Glynn,[1] who were monitoring incoming flights. After the Jaramillos walked past the agents and started down Concourse D, the agents, who were in plain clothes, began to follow them. Fenet made eye contact with one of the agents, and at some point along the way, the Jaramillos made a slight detour. The witnesses disagree exactly where the two defendants went, but soon they were going the same direction as they had started, and Agents May and Glynn continued to follow.

The two agents caught up with the Jaramillos in a vestibule area between two sliding glass exit doors and identified themselves as police officers. Agent Mays testified, and Magistrate Weisberg found, that the two agents did not attempt to block the Jaramillos' movements, did not display weapons and spoke in normal tones of voice. Rep. 13–14. Magistrate Weisberg also found that Agent Mays initially requested that the Jaramillos speak with him and Agent Glynn, told them that they were not under arrest and were free to leave, and that the Jaramillos both said "yes" in English. Rep. 14. While other travellers were passing through the vestibule, the agents asked to see the Jaramillos' tickets and some identification. Fenet translated this request into Spanish for Esther, whose English apparently is not very good, and Esther produced the tickets from her purse. The tickets were in the Jaramillos' correct names, were for a flight from Miami to Chicago with an open return to Miami and were purchased that same day with cash. Rep. 3. The Jaramillos also produced their driver's licenses and Esther's passport, each giving their correct names and matching the names on their tickets. Both Jaramillos testified that the agents kept the tickets and identification, but Magistrate Weisberg did not believe this and instead chose to credit Agent Mays' testimony that the items were returned to the Jaramillos. Rep. 15.

What happened next is subject to some dispute. Fenet testified that after he and Esther produced their tickets and identification, Mays and Glynn took and searched his carry-on bag and Esther's purse. Rep. 10. Esther testified that the agents did not wait even that long; as she was handing the tickets to Agent Glynn, Glynn grabbed her purse and searched it. Rep. 11. Once again, however, Magistrate Weisberg gave no credence to the Jaramillos and instead believed Agent Mays. Mays testified that he told the Jaramillos he was a narcotics agent conducting a narcotics investigation, asked permission to search their baggage and told them they had a right to refuse. The Jaramillos then spoke to each other in Spanish, and Fenet gave Mays permission to search his bag and Esther's purse. Rep.

---

[1] Mays and Christine Kolman, whom we discuss later, were Chicago police officers who were assigned to the DEA O'Hare task force. It is not clear whether Glynn was also a Chicago police officer or was employed by the DEA. We will do as Magistrate Weisberg did and refer to all three as DEA agents.

15. Mays and Glynn did so, and it is undisputed that no drugs were found.

Mays also testified that while he and Glynn were searching the baggage, he noticed a "bulkiness" around each defendant's waist. Rep. 6.[2] Since the purported bulkiness plays a key role in this case, Magistrate Weisberg ordered a supplemental hearing, six months after the original suppression hearing, for a courtroom demonstration. The Jaramillos were directed to wear the same clothes and to wear the elastic waistbands containing cocaine that were found when they were searched. It was Magistrate Weisberg's hope that "such a demonstration might clarify the extent to which bulkiness around their waists was noticeable and whether it resembled the ordinary corpulence of middle aged persons or was sufficiently unusual to provide a basis for reasonable suspicion." Rep. 18. But both sides objected to the reliability of this procedure, and no courtroom demonstration took place. Nonetheless, Magistrate Weisberg concluded that Fenet's body, at least, appeared unusually bulky. Fenet is relatively short and slightly built (five feet five inches and 132 pounds), and, as it turned out, he was carrying either 1.76 or 2.64 pounds of cocaine[3] in five packages around his waist. Esther has a larger build, but Magistrate Weisberg stated that it was plausible that the bulkiness showed on her as well. Rep. 19.

Based on this observation of bulkiness, Agent Mays asked the Jaramillos if they were carrying drugs, and Fenet said no. Rep. 16. What happened next is hotly contested. Mays testified that he pointed to Jaramillos' waist areas and asked, "You have something bulky on your waist. What is that?" When the Jaramillos said nothing, Mays asked permission to search or pat down their bodies, saying that they had a right to refuse. Fenet and Esther then spoke to each other, and, according to Mays, Fenet said that Mays could search

him and that Esther agreed to a pat-down search. Leaving the Jaramillos with Agent Glynn, Mays went and found DEA Agent Christine Kolman, who returned to the vestibule with Mays. Kolman identified herself and then told the Jaramillos in English and Spanish that she was there to search Esther, and that Esther had a right to refuse. According to Mays, the Jaramillos consented to a pat-down search, but when Kolman attempted to touch Esther in the waist area, Esther moved back, complaining of stomach problems. Kolman again said she would like to search that area, and then touched Esther's waist with the back of her hand. Esther grabbed the area and said that what Kolman felt was a girdle, but Kolman replied that it was not. Rep. 6–7.

Agent Kolman's tesimony essentially corroborated Agent Mays'. She added that both Jaramillos appeared unusually large around the waist area on the side. In addition, Kolman testified that the object she felt on Esther's waist was solid with an edge.

The Jaramillos' version of events was quite different. Fenet testified that after he denied carrying drugs, Agents Mays left and then returned with Agent Kolman. Kolman asked Esther in English if she had any drugs, using the Spanish word "druga," but Esther said no. Nonetheless, Kolman touched Esther on the stomach and asked "what you have over here?" When touched, Esther stepped back and said in Spanish that she did not have anything. See Rep. 10. Esther testified that the agents never told her that she could refuse to be searched. Rather, Fenet told her, "They said we have to be searched." According to Esther, when Kolman arrived, she tried to touch Esther, who stepped back. Kolman did not speak to Esther in Spanish, but told her "with a gesture" that she was going to search her and then touched her at the waist area. Esther told

---

**2.** Mays had also testified that he saw this bulkiness earlier, but Magistrate Weisberg never made an explicit finding concerning this testimony.

**3.** As Magistrate Weisberg noted, the record is not clear which Jaramillo carried which quantity of cocaine.

Kolman in Spanish that she did not have anything. Rep. 11–12.

Magistrate Weisberg gave credence to part of both stories. He believed Mays' testimony that he pointed to the Jaramillos' waists and asked them to explain the bulkiness, and that the Jaramillos did not respond. Rep. 22. He also believed Mays' testimony, corroborated by Kolman, that they asked the Jaramillos for permission to search. Rep. 16. But Magistrate Weisberg also credited the Jaramillos' testimony that they did not consent to the search—even though he rejected their testimony on every other major point.

After Agent Kolman touched Esther in the stomach area, she escorted Esther to a women's restroom with Fenet, Glynn and Mays following behind. The witnesses disagreed just how voluntary this was; the Jaramillos claimed that the agents grabbed their arms and essentially pulled them down the hall, Rep. 10, 12, while Mays and Kolman testified that they went to the restroom only after Fenet asked that the search be done somewhere more private. Rep. 7, 9. Magistrate Weisberg did not make an explicit finding on this, since it was unnecessary to his resolution of the issues. At any rate, when Esther and Agent Kolman went into the restroom, Kolman recovered six packages of cocaine from inside a blue elastic waistband worn by Esther. Meanwhile, outside the restroom, Mays and Glynn recovered five packages of cocaine from a similar blue waistband on Fenet's waist. Each package was approximately four inches by six inches, and altogether the cocaine weighed approximately 1995 grams. Again, the testimony differed as to how helpful the Jaramillos were at this point—the DEA agents testified that Fenet opened his shirt and Esther lifted her blouse to show the agents where the packages were, but the Jaramillos deny this—and Magistrate Weisberg made no explicit finding. After the cocaine was recovered, the Jaramillos were arrested. It is undisputed that they each declined to sign a *Miranda* waiver of rights form that was in Spanish and English. Rep. 3. It is also undisputed that approximately fifteen minutes elapsed from the agents' initial encounter with the Jaramillos until the pat-down search of Fenet. Rep. 20–21.

## II. The Magistrate's Proposed Conclusions

Based on the evidence adduced at the suppression hearing, Magistrate Weisberg proposed the following five conclusions. First, the initial encounter between the agents and the Jaramillos in the vestibule area was consensual and thus did not implicate the fourth amendment. Rep. 13. Second, the agents seized the Jaramillos when they asked them to consent to pat-downs or body searches. Rep. 16. Third, the Jaramillos' seizure was lawful since it was based on a reasonable suspicion of criminal activity. Rep. 19. Fourth, the detention was reasonable in duration and scope. Rep. 20–21. Fifth, as suggested above, the Jaramillos did not consent to the searches of their bodies. Rep. 21. Because no consent was given, Magistrate Weisberg recommended that the Jaramillos' motions to suppress be granted. Rep. 23.

## III. Motion to Reconsider

In his Report, Magistrate Weisberg reminded both sides that under 28 U.S.C. § 636(b)(1) (1982), they had ten days to file written objections with this Court. Both the government and the defendants filed objections within the statutory time period, but the government also filed a motion to reconsider with Magistrate Weisberg. In the motion, the government argued that even in the absence of consent, the agents had probable cause to arrest the Jaramillos and therefore could lawfully search them incident to that arrest. The government had not previously raised this argument, and, as a result, Magistrate Weisberg concluded that the argument was waived. Citing the judicial system's interest in "efficient management of a chronically overcrowded calendar," Magistrate Weisberg held that motions to reconsider "may not be used to introduce new evidence or legal theories which could have been presented earlier." Dec. 2 Ruling 4–5. Since we had not referred the motion to him for a Report and Recommendation, Magistrate Weisberg

treated the motion to reconsider as one addressed to his discretion and denied it.

## IV. The Objections

Under 28 U.S.C. § 636(b), we are required to "make a de novo determination of those portions of the [magistrate's] report or specified proposed findings or recommendations to which objection is made." A de novo hearing is not necessary, even if, as here, the issues turn on the credibility of witnesses. *United States v. Raddatz*, 447 U.S. 667, 674, 100 S.Ct. 2406, 2411, 65 L.Ed. 2d 424 (1980); *United States v. Hardin*, 710 F.2d 1231, 1235 (7th Cir.), *cert. denied*, 464 U.S. 918, 104 S.Ct. 286, 78 L.Ed.2d 263 (1983); 3 C. Wright, *Federal Practice and Procedure* § 675 at 787–88 (2d ed. 1982). Although a court "must do more than rubber stamp" the magistrate's conclusions, *English v. Local Union No. 46*, 654 F.2d 473, 478 (7th Cir.1981), "Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations," *Raddatz*, 447 U.S. at 676, 100 S.Ct. at 2413. Thus, the district court may accord the magistrate's proposed finding and recommendations " 'such weight as [their] merit commands and the sound discretion of the judge warrants.' " *Id.* at 683, 100 S.Ct. at 2416 (quoting *Mathews v. Weber*, 423 U.S. 261, 275, 96 S.Ct. 549, 556, 46 L.Ed.2d 483 (1976)).

With these principles in mind, we turn to the objections. As noted previously, both sides objected to Magistrate Weisberg's Report. The Jaramillos objected to his conclusion that the initial encounter was consensual, that the seizure of the Jaramillos was lawful, and that their detention was of reasonable scope and duration. On the other hand, the government objected to his finding that the Jaramillos were seized when asked to consent to pat-down searches, and that the Jaramillos did not consent to the search of their bodies. The government also objected to the Report on the additional ground that there was probable cause to arrest the Jaramillos, so any search incident to that arrest was legal.

We have read the transcript, and we now consider each of those objections in turn.

### A. *Was the Initial Encounter Between the Jaramillos and the Agents Consensual?*

Magistrate Weisberg's report categorized police-citizen contacts into three types: full blown arrests, investigatory stops (sometimes referred to as seizures) and consensual questioning. The Seventh Circuit has explained the differences this way:

> The Fourth Amendment has been interpreted to forbid police to arrest a person without probable cause, which is to say a high degree of suspicion that the person has committed a crime. An arrest is a profound and deeply resented interference with the liberty of the person, and to allow police to arrest people on anything less than a high degree of suspicion would restrict personal liberty more than has been thought justified by the needs of public security. When the restriction is less than that involved in a full-fledged arrest, the degree of suspicion required is less. If all that is involved in a police officer's accosting a person and asking him whether he would be willing to answer a few questions, the degree of suspicion required is zero. The intermediate case is that of the investigatory stop. If the police have enough suspicion to be able to articulate it ("articulate suspicion")—that is, if they have more than a pure hunch—they can stop a person briefly to ask him a few questions or to pat him down if they think he may have a weapon. They cannot take him down to the station house; that would be an arrest.

*United States v. Serna–Barreto*, 842 F.2d 965, 966 (7th Cir.1988) (citation omitted); *see also United States v. Black*, 675 F.2d 129, 133 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). Magistrate Weisberg concluded that the initial encounter between the Jaramillos and Agents Glynn and Mays fell into the category of consensual questioning, which does not implicate the fourth amendment at all.

We conclude that Magistrate Weisberg was right, and we adopt his proposed findings and recommendations on this issue. As Magistrate Weisberg noted, an encounter with the police is consensual if a reasonable person would have felt free to walk away. *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). The test is an objective one and looks to the "reasonable man's interpretation of the conduct in question." *Id.* 108 S.Ct. at 1980; *United States v. Boden,* 854 F.2d 983, 991 (7th Cir.1988). In addition, the test looks at the totality of circumstances, not at the particular details in isolation. *Chesternut,* 108 S.Ct. at 1979. "Relevant factors in determining whether a reasonable person would feel free to leave include the conduct of the police, the characteristics of the individual citizen, and the physical surroundings of the encounter." *United States v. Espinosa-Alvarez,* 839 F.2d 1201, 1205 (7th Cir.1987).

Magistrate Weisberg's findings, which we adopt here, fully support the conclusion that a reasonable person would have felt free to leave: "The agents identified themselves as law enforcement agents, did not display weapons and spoke in normal tones of voice.... Fenet's initial response, 'What can I do for you?' was not the statement of a man who was intimidated or overborne.... The court credits Mays' testimony that he initially asked the Jaramillos to speak with them, told them that they were not under arrest and were free to leave and that the Jaramillos both responded 'Yes' in English." Rep. 13–14.

The Jaramillos have advanced a number of arguments to support a contrary conclusion, but we reject them all. First, they submit that the findings of fact are inaccurate. We disagree. The findings were based on the Magistrate's evaluation of witness credibility, and the Jaramillos have pointed to nothing—such as inconsistent testimony by the agents or an inherently unbelievable story—that undermines his evaluation. Rather, they merely state that "the testimony as a whole lends to the conclusion that the defendant's [sic] version of the police conduct is more credible than the officers'." This bald assertion is not enough, and after reading the transcript of the suppression hearing, we accept Magistrate Weisberg's conclusions as our own.

The Jaramillos also argue that if they believed they were free to ignore the agents, they would have continued walking, apparently since they knew they had cocaine hidden on their bodies. This argument, however, is but a variant of the now discredited view that no sane person would voluntarily consent to a search that would uncover incriminating evidence. *See Higgins v. United States,* 209 F.2d 819, 820 (D.C.Cir.1954). The question, as the Supreme Court has made clear "is not whether the [suspect] acted in her ultimate self-interest, but whether she acted voluntarily." *United States v. Mendenhall,* 446 U.S. 544, 559, 100 S.Ct. 1870, 1880, 64 L.Ed. 2d 497 (1980). Similarly, the question here should be whether a reasonable person felt free to leave, not whether stopping was in the Jaramillos' self-interest. We have already concluded that a reasonable person would have felt free to leave, and, at any rate, the Jaramillos may have thought that stopping, as Magistrate Weisberg suggested, was the best way to dispel suspicion. Rep. 15.

The defendants also argue that Mays' and Glynn's identification of themselves as narcotics officers was a claim of authority the Jaramillos were not free to ignore, especially since it happened at the exit to the airport. This argument is untenable in light of *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion), where the Supreme Court held that the fact that a police officer identifies himself as such, without more, does not convert the encounter into a seizure. The fact that the Jaramillos were in the vestibule, getting ready to leave, when Mays and Glynn identified themselves is not sufficiently "more" to change the result. Nor does the fact that the agents identified themselves as narcotics officers change our result. Defendants' reliance on *Royer* on this point is misplaced; in *Royer,* the officers' identification of themselves as narcotics agents was

but one factor among many supporting the conclusion that the search was not consensual.

■ The rest of the Jaramillos' arguments on this issue are equally unavailing. While *United States v. Cordell*, 723 F.2d 1283, 1285 (7th Cir.1983), *cert. denied*, 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984), and other cases indicate that a person is seized when officers hold on to his tickets and driver's license, we have adopted Magistrate Weisberg's finding that Mays and Glynn returned the tickets and other material to the Jaramillos. Likewise, while difficulty in understanding English may make a person feel no choice but to comply with police requests, *United States v. Patino*, 649 F.2d 724, 727 (9th Cir.1981), *cited with approval in Espinosa–Alvarez*, 839 F.2d at 1205, Fenet translated the agents' questions for Esther. Esther's contention that there was no evidence to show Fenet was "linguistically competent" to translate into Spanish is specious; Fenet's own uncontradicted testimony was that he spent the first thirty-one years of his life in a Spanish-speaking country, and while his Spanish may have become rusty in his twenty-four years in the United States, it is beyond belief that he could not communicate with his wife. Finally, despite the Jaramillos' protestations to the contrary, we agree with Magistrate Weisberg that the exit vestibule, which was open to the public, was not an intimidating or coercive environment. Accordingly, we adopt Magistrate Weisberg's finding and his conclusion that the initial encounter between the agents and the Jaramillos was consensual.

B. *Were the Jaramillos Seized When the Agents Asked Them to Consent to Searches?*

■ The government has objected to Magistrate Weisberg's conclusion that the Jaramillos were seized when they were asked to consent to a pat-down search but has provided us with no arguments to support its position. But in light of *United States v. Borys*, 766 F.2d 304 (7th Cir. 1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct.

852, 88 L.Ed.2d 893 (1986), a case much like this one, any arguments would have been unsuccessful. In *Borys*, the Seventh Circuit concluded that "consensual questioning ... ripened into an investigative stop" when the agents "explained that they suspected Borys of transporting drugs and asked permission to search his luggage." *Borys*, 766 F.2d at 311. We conclude, as Magistrate Weisberg did, that *Borys* controls our resolution of the issue. Mays' testimony, which Magistrate gave credit to and which we adopt, indicated that Mays told the Jaramillos that he was conducting a drug investigation, asked if they were carrying drugs and inquired about the unusual bulkiness around their waists. "Mays in effect told the Jaramillos that he suspected them of possessing narcotics." Rep. 16. This, coupled with the request to search, turned the consensual questioning into a seizure, just as in *Borys*, and brought the fourth amendment into play. We therefore adopt Magistrate Weisberg's conclusion that the Jaramillos were seized when asked to consent to pat-down searches.

C. *Was There a Reasonable Suspicion to Seize the Jaramillos?*

■ After reviewing the circumstances known to the agents, Magistrate Weisberg concluded that although the issue was a "close one," Rep. 19, the agents had the required reasonable basis for suspecting the Jaramillos of criminal activity, and their seizure was therefore lawful. We agree with and adopt the findings that Magistrate Weisberg proposed. But we do not think that the issue is close at all; indeed, as we describe in section IV.F.2. below, we conclude that the facts are sufficient to support a finding of probable cause. If they are sufficient to support probable cause, they are certainly more than sufficient for a reasonable suspicion.

We adopt Magistrate Weisberg's findings and his conclusion that there was a reasonable suspicion to seize the Jaramillos, but we modify the conclusion to reflect

our belief that the issue is not close.[4]

### D. *Was the Seizure of the Jaramillos of Reasonable Scope and Duration?*

■ The Supreme Court has outlined the limits of a seizure or investigatory stop. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983); *see also United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Based on uncontested testimony, Magistrate Weisberg found that only fifteen minutes elapsed between the first encounter and when Fenet was searched. Since the investigative stop did not begin until the Jaramillos were asked to consent to a search, it is clear that the stop did not last too long. We adopt Magistrate Weisberg's conclusion that the stop was reasonable in duration.

■ On the other hand, we are not clear what the Magistrate proposed on the issue of reasonable scope. Both sides think that he held that the stop was reasonable in scope, but we are not so sure. Magistrate Weisberg correctly realized, Rep. 21, that "[a] search or frisk for evidence is not permitted" in an investigatory stop. *See Ybarra v. Illinois*, 444 U.S. 85, 93–94, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979); *United States v. Boden*, 854 F.2d 983, 994 (7th Cir.1988). Since he found that the searches of the Jaramillos were unconsented, his implicit finding was that the investigative stop exceeded its permissible scope. As we describe in the next section, we agree with the Magistrate's conclusion that the search was unconsented. Therefore, to clarify the matter, we modify the Report to hold that the investigative stop exceeded its permissible scope.

### E. *Did the Jaramillos Consent to be Searched?*

Magistrate Weisberg concluded that the Jaramillos did not consent to be searched, and the government argues that this is incorrect. The government claims that Magistrate Weisberg erred when he credited the Jaramillos on this issue, even though he did so nowhere else, and argues that much of the Jaramillos' testimony is unbelievable. We agree that much of the Jaramillos' testimony is incredible, in both senses of that term; for example, we do not believe that Fenet was carried down the hall. But there is no requirement that a finder of fact accept or reject one side's version in toto, and we see no reason to disagree with Magistrate Weisberg's conclusion on this issue. Moreover, the conclusion is corroborated by certain facts that were inconsistent with consent. Most importantly, all four witnesses, *see* Transcript 33, 144–45, 183, 232, testified that when Agent Kolman attempted to touch Esther's waist, Esther stepped or jumped back. We think that this supports a conclusion that consent was not given.

The government also argues that we should reject Magistrate Weisberg's conclusion, since it was premised on the theory that a person would not consent to search if he knew the police would find incriminating evidence. As we noted above, this premise was rejected in *United States v. Mendenhall*, 446 U.S. 544, 559, 100 S.Ct. 1870, 1880, 64 L.Ed.2d 497 (1980), where Justice Stewart stated that "the question is not whether the [defendant] acted in her ultimate self-interest, but whether she acted voluntarily." Magistrate Weisberg stated that "There is nothing to suggest any motive for the Jaramillos to voluntarily consent to a search of their bodies." Rep. 22. Based on this statement, the government argues that the premise for his conclusion is the premise rejected in *Mendenhall.* We do not construe the Report that way, and at any rate, his conclusion, as we suggest above, is supportable even without this premise. Accordingly, we adopt Magistrate Weisberg's conclusion that the Jaramillos did not consent to search. In order to clarify, however, we modify the Report

---

**4.** The relevant facts and legal issues are discussed in Part IV.F.2. of this opinion.

to make clear that we do not rely on the theory that a person would not consent to a search if he knew contraband would be found.

### F. Was There Probable Cause to Arrest the Jaramillos?

#### 1. Waiver

■ As noted previously, the government failed to argue that there was probable cause to search the Jaramillos until it submitted its motion to reconsider. As a result, Magistrate Weisberg concluded that the argument was waived. The government has renewed its argument in its objections to Magistrate Weisberg's Report, but the Jaramillos assert that the government's failure to raise the issue earlier bars our consideration of it.

We conclude that the argument was not waived. The language of 28 U.S.C. § 636(b)(1) points to such a result. That section provides "Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report ... to which objection is made." The statute does not mandate that the objection must deal only with the matters originally presented to the Magistrate. Moreover, our discretion in the de novo determination is broad; we can accept, reject or modify a magistrate's recommendations. The Jaramillos argue that considerations of finality require a waiver rule. But a magistrate's report and recommendation, by its very nature, is not final but subject to our de novo determination: as the Supreme Court has made clear, "The magistrate acts subsidiary to and only in aid of the district court.... [T]he entire process takes place under the district court's total control and jurisdiction."

*United States v. Raddatz,* 447 U.S. 667, 681, 100 S.Ct. 2406, 2415, 65 L.Ed.2d 424 (1980).

Our conclusion here is not contrary to *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). In *Thomas,* the Supreme Court held that a Court of Appeals, under its supervisory powers, may promulgate a rule precluding appellate review of any issue not contained in the objections. The Seventh Circuit has adopted such a rule. *See Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538 (7th Cir.1986). For the reasons we suggested above, we do not believe that the Seventh Circuit could promulgate a rule precluding consideration of facts or law raised for the first time in a timely objection. Moreover, even if it could, it has not done so. We conclude, therefore, the probable cause argument is not waived.[5]

#### 2. Probable Cause

■ That brings us to the merits of the government's probable cause argument. Under the fourth amendment, police officers are justified in making an arrest only if they have probable cause to believe that a person has committed or is committing a crime. *See, e.g., Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). When considering probable cause, we must inquire into the totality of the circumstances. *BeVier v. Hucal,* 806 F.2d 123, 126 (7th Cir.1986). The police have probable cause to arrest an individual when the facts and circumstances within their knowledge and of which they have reasonable trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed or was committing a crime. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *United States v. McCarthy,* 862 F.2d 143, 147 (7th Cir.1988); *United*

---

5. All of this is not to say that we are pleased with the government's failure to raise the probable cause argument earlier. Had they done so, they would have saved work for all concerned and not added to the "chronically overcrowded calendar." Dec. 2 Ruling 4.

We also note here that a different result might be appropriate if a party's failure to raise an argument before the filing of objections is due to bad faith or causes serious prejudice to the opposite side or the court system. However, there is no suggestion that the government has acted in bad faith, the Jaramillos have pointed to no prejudice, and we will be able to decide the issues without a new hearing. Accordingly, we can leave the consideration of bad faith and prejudice until another day.

States v. *Lima*, 819 F.2d 687, 688 (7th Cir.1987). " 'In dealing with probable cause ... we deal with ... the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)); *see also McCarthy*, 862 F.2d at 147. If there is probable cause, the police can arrest and can lawfully conduct a search incident to that arrest. *See, e.g., Michigan v. DeFillippo*, 443 U.S. 31, 35, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979). It does not matter if the search precedes the arrest, as long as there is probable cause to arrest at the time of the search and the formal arrests follows shortly thereafter. *Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980). Relying on these principles, the government argues that the facts found by Magistrate Weisberg indicate there was probable cause to arrest when Agent Kolman began to search Esther. Therefore, even if the search was non-consensual, it was still legal because it was incident to a lawful arrest.

We agree. The facts that Magistrate Weisberg found and which we adopt were sufficient to give a reasonable person probable cause to believe that the Jaramillos were carrying some type of contraband. In particular, the agents had been able to observe the bulkiness around the Jaramillos' waists at close range while questioning them in the vestibule. They also knew the Jaramillos had arrived from Miami, a source city,[6] and paid for their ticket in cash. They had seen Fenet Jaramillo scan his surroundings, as if to conduct counter-surveillance, and had seen both Jaramillos double back through Concourse D and then leave the escalator line when they saw the agents following them, as if to avoid detection. Finally, by the time the agents caught up with the Jaramillos at the vestibule, they had reason to believe that the Jaramillos had no baggage except Fenet's carry-on bag and Esther's purse. *See* Rep. 20. All in all, there was probable cause for arrest, and the search was therefore lawful.

We believe this case parallels the Seventh Circuit's decision in *United States v. Palen*, 793 F.2d 853 (7th Cir.1986). In *Palen*, as in this case, police officers working at O'Hare observed the defendant scanning the concourse area after he got off a plane from Fort Lauderdale (another source city). The officers also noticed that the defendant's pants "didn't hang right." The officers approached the defendant, who consented to questioning and discovered he had a one-way ticket under an assumed name from Fort Lauderdale to Chicago to Anchorage, paid for that same day in cash. The officers then informed the defendant they were conducting a drug investigation and asked the defendant if he had any drugs; this, according to the Seventh Circuit, transformed the consensual questioning into an investigatory stop. After receiving consent to search his gym bag and discovering some plastic wrap and Baggies, the officers seized the bags based on a reasonable suspicion that the defendant was using the Baggies in the drug trade. The officers told the defendant he was free to go but asked to see the defendant's driver's license again. As the defendant opened his jacket, one of the officers noted a large bulge, and the officer, without defendant's consent, patted down the bulge and then searched the jacket. The Seventh Circuit held that there was probable cause.

To be sure, there are differences between this case and *Palen*, as the Jaramillos are quick to point out; for example, the Jaramillos travelled under their correct names and the officers found no evidence of drugs when they searched the Jaramillos' bags. But the Seventh Circuit's opinion did not focus on these details and

---

**6.** To be sure, it seems that many cities are now considered source cities, and Justice Stevens, at least, appears to think that the designation of source cities is too broad. *See* Summary of Oral Argument, *United States v. Sokolow*, No. 87–1295, 44 Crim.L.Rptr. 4133, 4135 (U.S. Jan. 10, 1989). However, the Seventh Circuit has previously identified Miami as "a major source city for drugs." *United States v. Espinosa–Alvarez*, 839 F.2d 1201, 1206 (7th Cir.1987).

seemed to indicate that the bulge was enough. "Narcotics are often found after a search of bulges of the shape and/or size.... In sum, we agree with Judge Will when he concluded that Fulkerson, upon noticing the bulge, had probable cause to make a search of defendant's person and, ultimately, an arrest." *Palen,* 793 F.2d at 858. In this case, the unusual bulkiness, combined with the other factors listed above, gave rise to probable cause.

There are a number of similar bulge cases from other circuits. *See, e.g., United States v. Tomaszewski,* 833 F.2d 1532 (11th Cir.1987); *United States v. Lehmann,* 798 F.2d 692 (4th Cir.1986). We need not discuss them in any detail. In general, we believe they support the government's position. Defendants assert, however, that in all of these cases, the finder of fact was able to see firsthand what the bulge looked like, and since neither we nor Magistrate Weisberg have made firsthand observations, we cannot rely on the bulges to support a finding of probable cause. We cannot agree. First, the premise is not true. In *Tomaszewski,* the court specifically stated it was unfortunate that the cocaine was not presented at the suppression hearing so "the magistrate could judge the likelihood that an unusual bulge was visible." *Tomaszewski,* 833 F.2d at 1535–36. In addition, in *Palen,* the only case we are required to follow, it does not appear that the trial judge necessarily had a chance to observe what the bulge looked like; his finding about the bulge is just as likely to have been based on witness testimony. More importantly, we can see no reason why the findings in this type of case should be based on firsthand observation alone.

However, Magistrate Weisberg's finding concerning bulkiness could be read to apply only to Fenet. With regard to Esther, the Magistrate said only that it was "plausible that her waist area also had an unusual appearance, (especially when observed at close quarters in the vestibule.)" Rep. 19. Esther infers from this that Magistrate Weisberg did not make a proposed finding on this point, but we read the Report differently. Magistrate Weisberg later talks about "the bulkiness around the Jaramillos'

waists" and the "unusual bulkiness around their waists." Rep. 20. To clarify, we explicitly find that there was an unusual bulkiness about Esther's waist. This finding is supported by the testimony of both Mays and Kolman, whose testimony Magistrate Weisberg generally credited and by the fact that Esther was actually wearing approximately two pounds of cocaine in six packages around her waist.

Yet, even if the six packages of cocaine did not show on Esther's person, we conclude there was still probable cause to arrest her. To be sure, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person," *Ybbara v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979), but there was more here. In addition to the suspicious behavior described above, the agents had reasonable cause to believe that the Jaramillos travelled all the way from Miami with only Esther's purse and Fenet's carry-on bag, and that Esther was aware of this. Moreover, they had reason to believe Esther and Fenet were married. All in all, it strains credulity to suggest that if Fenet was transporting drugs—a fact the agents had probable cause to believe—Esther did not know about it. *Cf. United States v. Chadwick,* 393 F.Supp. 763, 771 (D.Mass.1975) (probable cause to arrest defendant, who travelled cross-country as co-defendant's wife, with a footlocker containing marijuana; "it strains credulity to suggest that a spouse would not know the contents of such a significant piece of luggage"), *aff'd on other grounds,* 532 F.2d 773 (1st Cir. 1976), *aff'd,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). In short, there was more than "mere propinquity" to support probable cause. Since there was probable cause, the agents could lawfully search the Jaramillos, and their motion to suppress must be denied.

### V. Conclusion

We adopt all of Magistrate Weisberg's proposed findings of fact. To clarify, we make explicit the finding that Esther Jaramillo showed an unusual bulkiness around

her waist. We make the following modifications to the proposed conclusions of law: (1) The issue of reasonable suspicion is not close; (2) Because there was an unconsented-to search, the investigative stop of the Jaramillos exceeded its possible scope; (3) The conclusion that the Jaramillos did not consent to search is not based on the theory that no one would consent to search if he knew incriminating evidence would be found; and (4) Because there was probable cause to arrest the Jaramillos at the time they were searched, that search was lawful, even without their consent. As modified, the Report is adopted. The motions to suppress are denied. It is so ordered.